Maximo SALCIDO, by his next friend, Amelia GILLILAND, Plaintiff,

v.

WOODBURY COUNTY, IOWA; Jessie Rasmussen, in her official capacity as Director of the Iowa Department of Human Services; and Thomas L. Vilsack, in his official capacity as Governor of the State of Iowa, Defendants.

No. C 98–4113–MWB.

United States District Court, N.D. Iowa, Western Division.

Oct. 30, 2000.

902

Frank Tenuta of Legal Services Corp. of Iowa, Sioux City, IA, for Plaintiff.

Doug Phillips of Klass, Stoik, Mugan, Villone Phillips, Orzechowski, Clausen & Lapierre, L.L.P., Sioux City, IA, for Defendant Woodbury County.

Gordon E. Allen, Deputy Iowa Atty. Gen., Mary W. Vavroch, Asst. Iowa Atty. Gen., Des Moines, IA, for State Defendants, Governor Thomas L. Vilsack and Director Jessie Rasmussen.

**MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. *INTRODUCTION* ................................................... ..903
 A. *Factual Background* ......................................... ..903
 1. *Salcido's commitment and placements* ...................... ..903
 2. *Mental health funding and management* .................... ..905
 B. *Procedural Background* ...................................... ..906
 1. *Preliminary matters* ...................................... ..906
 2. *The present motions for summary judgment* ................ ..907

II. *LEGAL ANALYSIS* ................................................ ..908
 A. *Standards For Summary Judgment* ............................ ..908
 B. *Salcido's Procedural Due Process Claim* ..................... ..909
 1. *The requirements of a procedural due process claim* ........ ..909
 2. *Does Salcido have a protectible interest?* ................. ..910
 a. *Sources of liberty interests* ........................... ..910
 b. *The parties' arguments* ............................... ..910
 c. *Liberty interests of involuntarily committed persons* ..... ..912
 i. *Youngberg v. Romeo* .............................. ..912
 ii. *Youngberg's Eighth Circuit progeny* ................ ..913
 iii. *Iowa authorities* ................................. ..913
 d. *Salcido's liberty interest* ............................. ..915
 3. *Did Salcido receive the process he was due?* ............... ..916
 a. *Salcido's interest* ................................... ..917
 b. *The government's interest* ............................ ..918
 c. *Risk of erroneous deprivation* ........................ ..918
 i. *Arguments of the parties* ......................... ..918
 ii. *The statutory scheme for involuntary commitment* ....... ..919
 *Adequacy of the notice, hearing, and decision-maker*
 iii. *provisions on their face* ........................... ..923
 *Adequacy of the notice and hearing procedures*
 iv. *actually provided* ................................ ..926
 v. *Impartiality of the decision-maker* ................. ..927
 C. *Salcido's Disability Discrimination Claims* .................. ..931
 1. *Disability discrimination by the State Defendants* ......... ..932

 *a. Liability based on plan approval* ........................... ..934
 *b. Liability based on refusal to admit* ......................... ..934
 2. *Disability discrimination by the County* ..................... ..936
 *a. Salcido's "qualification" for services* ...................... ..936
 *b. Discrimination "by reason of his disability"* ................ ..937
 *c. The County's affirmative defense* ......................... ..938
 D. *The State Defendant's Cross–Claim Against The County* .............. ..939
 1. *Arguments of the parties* ....................................... ..939
 2. *The County's liability for the costs of Salcido's care* .............. ..940

III. *CONCLUSION* ................................................... ..941

Who pays? That question often animates legal disputes between private persons or entities, but here it animates a dispute involving an individual who has been involuntarily committed pursuant to Iowa law, his "county of legal settlement," the governor of the state, and the director of the state department of human services. The plaintiff brought this action seeking a determination of whether the state or the county must pay for his placement at a state mental health institute. To compel that determination, the plaintiff has brought claims against the defendants for violation of his constitutional rights to equal protection and substantive and procedural due process, and disability discrimination claims pursuant to the Rehabilitation Act and Title II of the Americans with Disabilities Act. The state officials filed a cross-claim against the county seeking to compel the county to pay for the plaintiff's placement. All of the parties have now filed motions for summary judgment, which may resolve many of the claims at issue, at least in part.

## I. INTRODUCTION

### A. Factual Background

Although the court provided some factual background to the present dispute in its ruling on a motion to dismiss in September of 1999, *see Salcido v. Woodbury County, Iowa,* 66 F.Supp.2d 1035 (N.D.Iowa 1999), the parties' factual statements in support of the summary judgment motions presently before the court provide a much more detailed picture. Nevertheless, what is presented here is primarily a statement

of the nucleus of undisputed facts and essential factual disputes necessary to put the parties' motions for summary judgment or partial summary judgment in context, rather than an exhaustive dissertation of the undisputed and disputed facts as asserted by the parties.[1]

### 1. Salcido's commitment and placements

Plaintiff Maximo Salcido, who is now 61 years old, was diagnosed in 1998 as suffering from dementia—secondary to multiple etiologies—and a mood disorder. On June 29, 1998, Dr. Davidson of Sioux City Neurology wrote a "To Whom It May Concern" letter in which he noted that Salcido had disinhibited behavior and was very abusive and aggressive, that Salcido's rehabilitation potential was poor, and that he is a danger to himself and others. Consequently, on July 8, 1998, affidavits were prepared by health care professionals pursuant to IOWA CODE CH. 229 alleging that Salcido was seriously mentally impaired and should be immediately taken into custody. The affidavits were filed on July 9, 1998, which commenced the civil commitment proceedings from which the present lawsuit arises.

Based on the affidavits, on July 9, 1998, the hospitalization referee entered an "Order for Immediate Custody Pursuant to Section 229.11, The Code," in which the referee ordered that Salcido be immediately detained at Marian Health Center until a hearing set for July 15, 1998. The referee also appointed attorney Wil Forker to represent Salcido and appointed Dr. P.

---

1. Indeed, the State Defendants concur with the facts as set out in Salcido's brief in sup- port of his motion for summary judgment, adding only a few additional facts.

Muller to conduct a personal examination of Salcido to determine whether Salcido was seriously mentally impaired as defined in IOWA CODE § 229.1(14). Following the hearing on July 15, 1998, at which Mr. Forker appeared on behalf of Salcido[2] and Dr. Muller's report was entered into evidence, the referee found that Salcido was seriously mentally impaired, as defined by the Iowa Code, and was in need of immediate residential treatment as recommended by Dr. Muller. The referee also entered an order noting that Dr. Muller had recommended that, although Salcido remained mentally impaired, he was no longer in need of acute in-patient treatment. Therefore, the referee ordered that Salcido remain at Marian Health Center pending transfer to Clarinda Mental Health Institute (CMHI), a state mental health facility.

Next, on July 27, 1998, the referee ordered Salcido transferred to CMHI. CMHI initially indicated that it would accept Salcido under court order for the next available male bed. However, in late July of 1998, CMHI informed Marian Health Center that it would not accept Salcido, because defendant Woodbury County would not authorize Salcido's placement at CMHI. CMHI reported that the County had informed CMHI that Salcido's placement at CMHI would violate the County's Mental Health Services Management Plan.

An attempt to find state funding for Salcido's placement at CMHI failed when Merit Behavior Corporation, which contracts with the State of Iowa to administer mental health funds, including Title XIX funds, notified Marian Health Center and Salcido on August 4, 1998, that the State would not fund Salcido's placement at CMHI. Merit explained that residential services were not covered by the state's Merit Behavioral Care Mental Health Access Plan. The County contends that neither Salcido nor Marian Health Center pursued a grievance under the procedures afforded by Merit concerning Merit's denial of funding for Salcido's care at CMHI.

Attempts to find an alternative placement for Salcido also failed. The hospitalization referee entered an amended order on August 6, 1998, and an amended and substituted order on August 12, 1998, transferring Salcido from Marian Health Center to a suitable nursing home, skilled nursing home, or Alzheimer's facility. However, on August 27, 1998, Marian Health Center, through counsel, informed the referee that it had contacted eleven facilities, but all had declined to accept Salcido.

At about the same time, renewed attempts were made to obtain funding from the County for Salcido's placement at CMHI. On August 7, 1998, Assistant County Attorney Ann Long sent the referee a letter advising him that Marian Health Center should apply to the County's mental health funding management company, Tri–State Behavioral Health Care Association (Tri–State), for funding for Salcido's placement. Ms. Long's letter noted, however, that Salcido was currently receiving Title XIX benefits under the state mental health access plan, that Salcido had a "cognitive disorder, not a mental illness," and that Tri–State would likely deny Salcido's application for County funds. Plaintiff's Documents in Support of Summary Judgment at 18. In response to this letter, Dr. Muller sent a letter dated August 19, 1998, to Tri–State explaining his diagnosis of Salcido's condition and appealing the denial of funding under the County's Management Plan.

On September 24, 1998, the referee entered an order appointing Frank Tenuta to represent Salcido in place of Mr. Forker. Mr. Tenuta and Assistant County Attorney Long exchanged letters about Salcido's placement at CMHI, but did not resolve the situation. On October 16, 1998, Marian Health Center sent a letter to the Woodbury County Board of Supervisors requesting action on Dr. Muller's August 19, 1998, "appeal." On October 20, 1998, Assistant County Attorney Long sent a

---

2. Counsel waived Salcido's personal presence at this hearing.

letter to Tri–State recommending that an intermediary appeal step be skipped in Salcido's case and that the appeal instead go directly to the County Board of Supervisors. The County notified Marian Health Center that an appeal hearing before the Board of Supervisors regarding Salcido was scheduled for November 17, 1998. The appeal hearing was subsequently rescheduled, by agreement of the parties, to December 8, 1998.

Apparently as part of its appeal process, the Board of Supervisors received a letter, dated December 8, 1998, from Dr. Dale Wassmuth, a physician reviewer with Tri–State, offering an alternative diagnosis of Salcido's condition as "dementia due to other medical conditions" and "head injury with brain injury," and concluding that Salcido had "never met full criteria for a depressive episode while free of the effects of brain injury." Plaintiff's Documents in Support of Motion for Summary Judgment at 37. On December 18, 1998, by letter from Assistant County Attorney Long, the Board of Supervisors notified Dr. Muller of its determination on appeal. Ms. Long informed Dr. Muller that the Board had concluded that Salcido is ineligible for funding under the County's Mental Health Services Management Plan for the following reasons: (1) Salcido's primary diagnosis is dementia, which is excluded from the definition of mental illness in the County's Management Plan, and the County's Management Plan had been approved by the Iowa Department of Human Services; (2) the Board "conceived of the County's Management Plan as the provision of services of last resort," while Salcido, as a recipient of Title XIX funds, had not exhausted his appeal rights defined in the contract between the Iowa Department of Human Services and Merit Behavioral Care Corporation; and (3) the County's Management Plan then in place, and made effective retroactively to July 1, 1998, "does not provide long-term residential care services for any member of the MI/CMI [Mentally Ill/Chronically Mentally Ill] population." Plaintiff's Documents in Support of Motion for Summary Judgment at 38–39. The County contends that Salcido received full and impartial consideration by the Woodbury County Board of Supervisors of his challenge to the eligibility decision in his case.

Following denial of his placement appeal, Salcido remained at Marian Health Center even though Dr. Muller continued to be of the opinion that CMHI was the only appropriate placement for him. The acute care stabilization unit at Marian Health Center, in which Salcido was detained, is a locked unit, and for that reason Salcido's doctor considered it to be overly restrictive: Salcido did not have the opportunity for appropriate activities or socialization and was at an increased risk of infection. Indeed, Salcido developed pneumonia on February 14, 1999, and was transferred to a medical unit at Marian Health Center. He returned to the behavioral floor on February 25, 1999. Because of his deteriorated health, his treatment staff believed he would not be dangerous at a nursing home. Salcido was therefore discharged to a nursing home on March 3, 1999, but had to be returned to Marian Health Center on March 12, 1999, because he had become combative and aggressive. Salcido was eventually admitted to CMHI at state expense under the terms of a stipulated preliminary injunction dated May 17, 1999. He remains there at this time.

### 2. Mental health funding and management

The cost of Salcido's care at Marian health Center was $950 per day, which was paid by Title XIX funding, while the cost at CMHI for fiscal year 1999 was $236.87 per day. Of the cost at CMHI, $184 per day would have been assessed to the County.

Legislation passed in 1994 requires each county in Iowa to have a county mental health services management plan, which is submitted to the Iowa Department of Human Services (IDHS) for approval. Each county's plan for the follow-

ing fiscal year must be submitted by April 1 (for example, by April 1, 1997, for fiscal year 1998, which starts on July 1, 1997). IOWA CODE § 331.439(1). However, Woodbury County's proposed fiscal year 1998 plan was not approved prior to the beginning of the 1998 fiscal year. After requests for clarification from the IDHS, discussions and negotiations related to the language of the County's plan, and the County's submission of changes, the plan was eventually approved on March 17, 1998. Similarly, the County's proposed fiscal year 1999 plan was not approved prior to the beginning of the 1999 fiscal year. Instead, the fiscal year 1999 plan was approved on December 7, 1998. Thus, the State Defendants contend that, at the time commitment proceedings for Salcido were commenced on July 8, 1998, Woodbury County was still working under its fiscal year 1998 County Management Plan. However, the County's position, as stated in the letter from Assistant County Attorney Long informing Salcido of the decision of the Board of Supervisors, is that the 1999 plan was "retroactive" to July 1, 1998, following approval of the plan on December 7, 1998. The County's 1999 Mental Health Services Management Plan excludes persons suffering from dementia from eligibility for services.

The County indicated in answer to discovery requests that its total budget for the fiscal year 1999–2000 is $37,598,064, and that, of that amount, $7,879,947 is for mental health. The County contracts with Tri–State for a set amount to be spent on mental illness funding. As to the State's financing of mental health services, in 1998, pursuant to a contract between the IDHS and Merit Behavioral Corporation, Merit administered the Iowa Medicaid Managed Mental Health Care Plan, which is funded by Title XIX funds. On October 28, 1998, the IDHS and Merit entered into a new contract entitled the Iowa Plan for Behavioral Health. Under this contract, Merit Behavioral Care Corporation of Iowa administered the medical assistance program for the IDHS. The IDHS and the County both receive federal funding for programs for individuals with mental disabilities.

### B. Procedural Background

### 1. Preliminary matters

In an attempt to compel the defendants to place him in the institution to which he had been committed, Salcido filed this lawsuit on December 18, 1998, against Woodbury County, referred to herein as "the County," and against Governor Thomas J. Vilsack and Jessie Rasmussen, the Director of the IDHS, referred to herein as the "State Defendants." In his Complaint, Salcido asserted several claims. First, in claims brought pursuant to 42 U.S.C. § 1983, Salcido asserted that the defendants have violated his right to equal protection by treating him differently than similarly situated individuals; violated his right to substantive due process by denying him adequate treatment; and violated his right to procedural due process by denying him appropriate placement under state and federal law and thereby depriving him of liberty. In a claim pursuant to Title II of the Americans with Disabilities Act (ADA), specifically, 42 U.S.C. § 12133, Salcido asserted that he is a disabled person qualified for care and treatment, but that the defendants have discriminated against him by excluding him from an appropriate placement on the basis of his disability. Finally, in a claim pursuant to the Rehabilitation Act (RA), 29 U.S.C. § 794(a), Salcido asserts that he is a disabled person qualified for care and treatment, but that he has been denied access to the benefits and services provided by the defendants' federally-funded programs for the mentally disabled. Salcido sought declaratory and injunctive relief, damages, costs, and such other relief as the court deemed appropriate.

Salcido also filed a motion for preliminary injunction on April 19, 1999. The parties agreed to the entry of a stipulated preliminary injunction on May 17, 1999, under the terms of which Salcido was admitted to the CMHI at state expense. However, under the terms of the prelimi-

nary injunction, no party waived any defense or claim to payment for Salcido's care, and the issue of who is responsible for payment of past and future expenses for Salcido's care was preserved for further consideration in these proceedings.

The County answered Salcido's Complaint on January 29, 1999. Instead of answering, the State Defendants moved to dismiss Salcido's Complaint, on various grounds, on February 11, 1999. On September 16, 1999, the court granted the State Defendants' February 11, 1999, motion to dismiss only as to Salcido's equal protection claim, but denied the motion to dismiss as to the rest of Salcido's claims. *See Salcido v. Woodbury County, Iowa,* 66 F.Supp.2d 1035, 1053 (N.D.Iowa 1999). Thereafter, on January 31, 2000, the State Defendants answered Salcido's Complaint and asserted a cross-claim against Woodbury County. In their cross-claim, the State Defendants assert that the County, as Salcido's county of legal settlement, is mandated by Iowa Code Ch. 229 to pay for services for Salcido at an appropriate facility following commitment proceedings, but the County has failed to do so. Therefore, the State Defendants pray for declaratory judgment that the County was responsible for designating an appropriate facility to which the hospital referee could commit Salcido on July 15, 1998, when Salcido did not require care at Marian Health Center; declaratory judgment that the County is responsible for the costs of Salcido's care at all times from the time that the referee determined that he was seriously mentally impaired and required commitment to a facility appropriate to his needs; and a determination that the County is responsible for all costs expended by CMHI for the care and treatment of Salcido since his admission to the facility and the County must pay such costs to defendant Rasmussen for the benefit of CMHI, as directed by IOWA CODE CH. 230. The County answered the State Defendants' cross-claim on March 24, 2000.

### 2. The present motions for summary judgment

A second, and more comprehensive round of dispositive motions is now before the court. On July 19, 2000, Salcido moved for summary judgment on some of his claims, in part or in their entirety. First, Salcido seeks summary judgment that the County and State Defendants violated his rights to *procedural* due process by failing to provide adequate notice and opportunity for hearing and by failing to provide an impartial decision-maker regarding his placement at CMHI. He seeks declaratory and injunctive relief on these claims pursuant to summary judgment. However, Salcido notes that he makes no claim for damages against the State Defendants on these claims, and he contends that there are genuine issues of material fact regarding damages to which he is entitled from the County on these claims. Salcido also seeks summary judgment on his ADA and RA claims, to the extent of declaratory and injunctive relief against the County and the State Defendants. Salcido again acknowledges that he cannot obtain damages relief against the State Defendants on these claims, although he asserts that there are genuine issues of material fact regarding damages he is due from the County on these claims. The County resisted Salcido's motion on August 11, 2000, and the State Defendants resisted it on August 14, 2000. Also on August 11, 2000, the County filed its own motion for summary judgment on Salcido's claims and, at least by implication, on the State Defendants' cross-claim.[3] The State Defendants and Salcido resisted the County's motion for summary judgment, on August 17, 2000, and August 25, 2000, respectively. On August 14, 2000, the State Defendants filed two motions for summary judgment, one against plaintiff Salcido on his claims and the other against the County on the State Defendants' cross-claim. The County resisted the

---

**3.** The County's motion for summary judgment does not identify the party or parties against whom it is brought.

State Defendants' motion for summary judgment on the cross-claim on August 18, 2000. Salcido resisted the State Defendants' motion for summary judgment on his claims on August 25, 2000. However, in his resistance, Salcido "abandoned" his *substantive* due process claim against the State Defendants.

Thus, while Salcido still asserts equal protection, substantive and procedural due process, ADA, and RA claims against the County, he only asserts procedural due process, ADA, and RA claims against the State Defendants. The court dismissed Salcido's equal protection claim against the State Defendants and Salcido has now abandoned his substantive due process claims against these defendants. However, neither Salcido nor the County has put at issue either Salcido's equal protection or substantive due process claims against the County in the summary judgment motions presently before the court. Thus, whatever the outcome of the various motions for summary judgment, these claims against the County will remain at issue.

The court heard oral arguments on the motions on October 13, 2000. At these oral arguments, plaintiff Maximo Salcido was represented by Frank Tenuta of Legal Services Corporation of Iowa, in Sioux City, Iowa. Defendant Woodbury County was represented by Doug Phillips of Klass, Stoik, Mugan, Villone Phillips, Orzechowski, Clausen & Lapierre, L.L.P., in Sioux City, Iowa. The "State Defendants," Governor Thomas L. Vilsack and Director Jessie Rasmussen, were represented by Gordon E. Allen, Deputy Iowa Attorney General, and Mary W. Vavroch, Assistant Iowa Attorney General, in Des Moines, Iowa. This matter is now fully submitted.

## II. LEGAL ANALYSIS

### A. *Standards For Summary Judgment*

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to FED. R. CIV. P. 56 in a number of prior decisions. *See, e.g., Swanson v. Van Otterloo,* 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998);

*Dirks v. J.C. Robinson Seed Co.,* 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); *Laird v. Stilwill,* 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); *Rural Water Sys. # 1 v. City of Sioux Ctr.,* 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997) *aff'd in pertinent part,* 202 F.3d 1035 (8th Cir.2000); *Tralon Corp. v. Cedarapids, Inc.,* 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), *aff'd,* 205 F.3d 1347, 2000 WL 84400 (8th Cir. 2000) (Table op.); *Security State Bank v. Firstar Bank Milwaukee, N.A.,* 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); *Lockhart v. Cedar Rapids Community Sch. Dist.,* 963 F.Supp. 805 (N.D.Iowa 1997). Thus, the court will not consider those standards in detail here. Suffice it to say that Rule 56 itself provides, in pertinent part, as follows:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

FED. R. CIV. P. 56(b) & (c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh

the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). Therefore, a court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, and give the non-moving party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394. Furthermore, "[w]here the unresolved issues are primarily legal rather than factual"—as the parties assert is the case here—"summary judgment is particularly appropriate." *Arnold v. City of Columbia, Mo.*, 197 F.3d 1217, 1220 (8th Cir. 1999) (citing *Crain v. Board of Police Commissioners*, 920 F.2d 1402, 1405–06 (8th Cir.1990)); *Haberer v. Woodbury County*, 188 F.3d 957, 961 (8th Cir.1999) (also citing *Crain*); *Cearley v. General Am. Transp. Corp.*, 186 F.3d 887, 889 (8th Cir.1999) (same).

With these standards in mind, the court turns to consideration of the parties' various motions for summary judgment. Because the issues raised in the various motions for summary judgment are inextricably intertwined, the court will take a "thematic" approach to disposition of the motions, that is, the court will consider each claim or cross-claim at issue in turn, rather than attempting to address the individual motions in turn.

### B. Salcido's Procedural Due Process Claim

The first claim at issue in all of the parties' motions for summary judgment is Salcido's claim of a violation of procedural due process. This claim alleges that the defendants violated Salcido's right to procedural due process by denying him appropriate placement under state and federal law and thereby depriving him of a "liberty" interest. More specifically, Salcido contends that he is entitled to summary judgment on this claim, because, as a matter of law, the County and State Defendants violated his right to procedural due process by failing to provide adequate notice and opportunity for hearing and by failing to provide an impartial decisionmaker to protect his right to an appropriate placement following his involuntary civil commitment. The court must first examine the requirements of Salcido's procedural due process claim, then turn to the question of whether Salcido can satisfy these requirements as a matter of law, which would entitle him to summary judgment, or can generate genuine issues of material fact on this claim in order to defeat summary judgment in favor of the defendants.

### 1. The requirements of a procedural due process claim

"The possession of a protected life, liberty, or property interest is a condition precedent to invoking the government's obligation to provide due process of law." *Stauch v. City of Columbia Heights*, 212 F.3d 425, 429 (8th Cir.2000); *Hopkins v. Saunders*, 199 F.3d 968, 975 (8th Cir.1999) ("To establish a procedural due process violation, a plaintiff must demonstrate that he has a protected property or liberty interest at stake and that he was deprived of that interest without due process of law."); *Dunham v. Wadley*, 195 F.3d 1007, 1009 (8th Cir.1999) ("The analysis of a

procedural due process claim must begin with examination of the interest allegedly violated."). Thus, Salcido must first show that he possesses the sort of protectable interest that triggers federal due process guarantees. *Id.; Hopkins*, 199 F.3d at 975; *Dunham*, 195 F.3d at 1009; *Spitzmiller v. Hawkins*, 183 F.3d 912, 915 (8th Cir.1999) (quoting *Gordon, infra*); *Gordon*, 168 F.3d at 1114 ("To set forth a procedural due process violation, a plaintiff, first, must establish that his protected liberty or property interest is at stake.").

Second, where a plaintiff has a protected liberty or property interest, "[t]o establish a procedural due process violation, a plaintiff must demonstrate ... that he was deprived of that interest without due process of law." *Hopkins*, 199 F.3d at 975; *Gordon*, 168 F.3d at 1114 ("Second, the plaintiff [asserting a procedural due process claim] must prove that the defendant deprived him of such [a liberty or property] interest without due process of law."). "A procedural due process claim focuses not on the merits of a deprivation, but on whether the State circumscribed the deprivation with constitutionally adequate procedures." *Parrish v. Mallinger*, 133 F.3d 612, 615 (8th Cir.1998). Therefore, the court must determine what process is due in the circumstances of the case. *Hopkins*, 199 F.3d at 975; *accord Stauch*, 212 F.3d at 431; *Morgan v. Rabun*, 128 F.3d 694, 699 (8th Cir.1997); *Bliek v. Palmer*, 102 F.3d 1472, 1475 (8th Cir.1997).

### 2. Does Salcido have a protectable interest?

#### a. Sources of liberty interests

 As to the first requirement of a procedural due process claim—a protectable· interest, *see, e.g., Stauch*, 212 F.3d at 429; *Hopkins*, 199 F.3d at 975; *Dunham*, 195 F.3d at 1009; *Spitzmiller*, 183 F.3d at 915; *Gordon*, 168 F.3d at 1114—the Supreme Court has explained that the source of protectable liberty interests is, at least in the first instance, the Federal Constitution:

In *[Board of Regents of State Colleges v.] Roth*, [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)], this Court repeated the pronouncement in *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042, (1923) that the liberty guaranteed by the Fourteenth Amendment " 'denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized ... as essential to the orderly pursuit of happiness by free men.' " *Roth, supra*, at 572, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (quoting *Meyer, supra*, at 399, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042).

*Conn v. Gabbert*, 526 U.S. 286, 291, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999). However, as the Eighth Circuit Court of Appeals has also explained,

The Federal Due Process Clause defines only the minimum protections required. State law, however, may recognize *more extensive* liberty interests than the Federal Constitution. *See Mills [v. Rogers]*, 457 U.S. [291,] 300, 102 S.Ct. [2442,] 2448, 73 L.Ed.2d 16 [ (1982) ]. These state-created liberty interests are entitled to protection under the Fourteenth Amendment's Due Process Clause. *See id.*

*See Morgan v. Rabun*, 128 F.3d 694, 697 (8th Cir.1997) (emphasis added). "[A] liberty interest created by state law is by definition circumscribed by the law creating it." *Dobrovolny v. Moore*, 126 F.3d 1111, 1113 (8th Cir.1997) (quoting *Montero v. Meyer*, 13 F.3d 1444, 1450 (10th Cir.), *cert. denied*, 513 U.S. 888, 115 S.Ct. 231, 130 L.Ed.2d 156 (1994)).

#### b.· The parties' arguments

Salcido argues that he has liberty interests or substantive rights on which his procedural due process claim can be based that are drawn from both federal and state

law. He contends, first, that, as an involuntarily committed person, he has a liberty interest in minimally adequate treatment pursuant to *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). He also contends that, under state law, he has a right to "necessary psychiatric services and additional care and treatment as indicated by [his] condition," *see* IOWA CODE § 229.23, and a right to "complete psychiatric evaluation and appropriate treatment." *See* IOWA CODE § 229.13; *see also* IOWA CODE § 229.14(2) (the chief medical officer's report to the hospital referee on the psychiatric evaluation shall state, as one alternative, "[t]hat the respondent is seriously mentally impaired and in need of full-time custody, care and treatment in a hospital, and is considered likely to benefit from treatment. If the report so states, the court shall enter an order which may require the respondent's continued hospitalization *for appropriate treatment.*") (emphasis added).

Although the County does not challenge Salcido's procedural due process claim on the ground that he has no protectable interest on which to found such a claim,[4] the State Defendants do. The State Defendants assert that "Salcido claims to have a liberty interest in notice and hearing on placement," but they argue that one cannot have a liberty interest in mere procedures. *See* Defendants Rasmussen and Vilsack's Memorandum Resisting Salcido's Motion For Summary Judgment And In Support Of Rasmussen and Vilsack's Motions For Summary Judgment Against Salcido And Woodbury County (State Defendants' Brief) at 8. The State Defendants also contend that, like prisoners, Salcido has no liberty interest in a placement at a particular institution. Furthermore, the State Defendants argue that, even if Salcido has a right to "appropriate care and treatment," that right is a different "liberty interest" from an interest in placement in a particular facility. The State Defendants note that the pertinent Iowa statutes explicitly assign the responsibility of place-

ment and the determination of the level of care needed by the committed individual to the chief medical officer, subject to approval by the court. Hence, the State Defendants contend that Salcido's procedural due process claim fails for lack of any liberty interest or substantive right to which procedural due process can attach.

The court agrees with the State Defendants' general proposition that one cannot have a liberty interest in mere procedures, at least to the extent that the Supreme Court has held that state laws setting forth procedural restrictions take on constitutional significance only if those laws contain "explicitly mandatory language in connection with requiring specific substantive predicates." *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, the court does not find that Salcido has ever argued that he had a liberty interest in notice and hearing on placement, as the State Defendants contend. Rather, Salcido has argued that he has a liberty interest in appropriate treatment and placement that entitled him to the procedural safeguards, which he did not receive, of notice and a hearing on placement. *See* Complaint, Claims for Relief, Section 1983 Claims at ¶ 29 ("Defendants have deprived Plaintiff of his rights to appropriate placement under state law and to liberty without due process of law."); Plaintiff's Brief In Support Of Motion For Summary Judgment at 14–16 (identifying substantive rights upon which the procedural due process claim is based as rights to appropriate treatment in an appropriate placement). The court also does not understand Salcido to be asserting a liberty interest in placement *at CMHI,* as the State Defendants contend. Rather, as indicated just above, Salcido has formulated his procedural due process claim in his Complaint and in his briefs in support of and resistance to motions for summary judgment as founded on a substantive right or liberty interest in *an appropriate* placement—albeit one he con-

---

**4.** The County instead asserts that Salcido re-

ceived all the process to which he was due.

tends, on the authority of his treating physician, can only be had in Iowa at the CMHI.[5] This conclusion also answers, at least for purposes of this case, the State Defendants' contention that involuntarily committed persons, like prisoners, do not have a liberty interest in a particular placement. *See Freitas v. Ault*, 109 F.3d 1335, 1337–38 (8th Cir.1997). That contention simply does not relate to any claim for a liberty interest that the court finds is at issue here. Rather, the question before the court is whether Salcido has a liberty interest in an *appropriate* placement, as he contends.

### c. Liberty interests of involuntarily committed persons

"It is undisputed that 'civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *United States v. McAllister*, 225 F.3d 982, 989 (8th Cir. 2000) (quoting *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)); *accord Vitek v. Jones*, 445 U.S. 480, 491–92, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) (an involuntary civil commitment is a "'massive curtailment of liberty,' *Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 31 L.Ed.2d 394 (1972), and in consequence 'requires due process protection.' *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)."); *Collins v. Bellinghausen*, 153 F.3d 591, 596 (8th Cir.1998) ("[L]iberty from bodily restraint is protected by the Due Process Clause of the Fourteenth Amendment [and][t]his liberty interest is implicated in involuntary commitment proceedings."). Furthermore, in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court recognized that the liberty interests of involuntarily committed persons extend beyond the initial deprivation of liberty to retention of liberty interests in safety, freedom from bodily restraint, and *minimally ade-*

*quate treatment or training.* The court will explore the *Youngberg* decision in more detail.

### i. Youngberg v. Romeo.

In *Youngberg*, the mentally retarded plaintiff, Romeo, had been involuntarily committed to a Pennsylvania state institution. *See Youngberg*, 457 U.S. at 309–10, 102 S.Ct. 2452. He filed suit seeking damages for injuries he suffered in the institution and for the denial of appropriate treatment, in violation of his Eighth and Fourteenth Amendment rights. *Id.* at 310–11, 102 S.Ct. 2452. A jury returned a verdict for the defendants, but the Third Circuit Court of Appeals, sitting *en banc*, reversed and remanded for a new trial. *Id.* at 312, 102 S.Ct. 2452. The *en banc* court concluded that the Fourteenth Amendment and the liberty interests protected by that Amendment provided the proper constitutional basis for the rights of involuntarily committed persons, concluding, in consequence, that the trial court had erred by instructing the jury in terms of Eighth Amendment standards. *Id.* However, the *en banc* court did not agree on the relevant standard to be used in determining whether the plaintiff's rights had been violated. *Id.* at 313, 102 S.Ct. 2452.

On a writ of *certiorari*, the Supreme Court concluded, first, that "[t]he mere fact that Romeo has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment." *Id.* at 315, 102 S.Ct. 2452. Rather, the Court concluded that, "[i]n the circumstances presented by this case, and on the basis of the record developed to date, we ... conclude that respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319 & n. 24, 102 S.Ct. 2452 (noting that, in the concurring opinion in the appellate court

---

5. While Salcido concedes that there may be genuine issues of material fact as to what placement is *appropriate,* and hence there is a genuine issue of material fact on his *substantive* due process claim for substantive depriva-

tion of his liberty interest in an *appropriate placement,* that concession leaves intact the basis for Salcido's procedural due process claim, a protectable liberty interest in an appropriate—although not specific—placement.

with which the Supreme Court agreed, the concurring judge had "used the term 'treatment' as synonymous with training or habilitation"). However, the court concluded that such interests were not "absolute"; rather, "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Id.* at 321, 102 S.Ct. 2452; *see also Heidemann v. Rother*, 84 F.3d 1021, 1028–29 (8th Cir.1996) (discussing *Youngberg* in the context of restraint of a severely mentally retarded child by school system employees).

### ii. *Youngberg's Eighth Circuit progeny.*

In *Hanson v. Clarke County, Iowa*, 867 F.2d 1115 (8th Cir.1989), the Eighth Circuit Court of Appeals discussed *Youngberg* in the context of *voluntary* commitment of an individual. *Hanson*, 867 F.2d at 1119–21. The plaintiff contended that the defendant county board of supervisors "has a constitutional duty to fund the exercise of her alleged constitutional right to placement in the 'least restrictive environment consistent with qualified professional judgment.'" *Id.* at 1120.

The Eighth Circuit Court of Appeals rejected the plaintiff's contention, in pertinent part, as follows:

> While it is clear that the Iowa statutory scheme creates a substantive right to appropriate care and treatment, neither the state law nor the liberty interests explicated in *Youngberg* create a substantive due process right to optimal care and treatment.
>
> The cases relied upon by Hanson are inapposite. *Youngberg* recognizes that the involuntarily committed retain liberty interests in safety, freedom from bodily restraint and suitable training. 457 U.S. at 324, 102 S.Ct. at 2462 (emphasis added). Even if the *Youngberg* holding could be properly extended to a case such as this where the plaintiff has been voluntarily institutionalized, it would be of no help to Hanson. The rights recognized by the *Youngberg* Court are not absolute. The *Youngberg* opinion recog-

nizes that these rights are qualified and must be balanced against important state interests. *Id.* at 321, 102 S.Ct. at 2461. More importantly, *Youngberg* recognizes a right to ["]*minimally adequate* training," not optimal training. *Id.* at 322, 102 S.Ct. at 2461 (emphasis added). There is no question that the Oconomowoc placement is the optimal placement for Hanson. All of the parties and the experts agree on that point. She has, however, no constitutional right to such a placement. She has only a right under the Iowa statutory scheme to an adequate placement. Further, the other cases relied upon by Hanson do not hold that she is entitled to choose the least restrictive environment in a private institution and then compel the state to fund that placement. Rather, these cases hold that once an individual is institutionalized in a state institution, he or she is entitled to the least amount of bodily restraint possible under the circumstances. *See, e.g., [Retarded Citizens v.] Olson*, [561 F.Supp. 473,] 485 [ (D.N.D.1982) ].

*Hanson*, 867 F.2d at 1120. Thus, *Hanson*, like *Youngberg*, stands for the proposition that an involuntarily committed person has substantive rights or a liberty interest in "an adequate placement," but not in a *particular* placement.

### iii. *Iowa authorities.*

As Salcido points out, the Iowa Supreme Court has recognized that the substantive right or liberty interest defined by provisions of the Iowa Code applicable here appear to be consistent with the liberty interest defined in *Youngberg*. In *Jasper County v. McCall*, 420 N.W.2d 801 (Iowa 1988), the Iowa Supreme Court considered an *involuntary* commitment case in which the person facing commitment suffered from a serious mental impairment, as defined in IOWA CODE § 229.1(2). *McCall*, 420 N.W.2d at 801. However, the respondent's impairment, according to the findings of the referee, required "highly spe-

cialized and expensive treatment which is available only outside Iowa." *Id.*

In *McCall,* the Iowa Supreme Court read Iowa Code §§ 229.13 and 229.21, which vest the referee with the power to place impaired persons in a hospital or other suitable facility, to vest the referee with the authority to place persons outside Iowa, if necessary, even though the statute was silent on that issue. *Id.* at 803.

The county's reading of the statutes, limiting placement to an area where adequate treatment has been found unavailable, would be of highly doubtful constitutionality. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the court defined the fourteenth amendment substantive rights of involuntarily committed mentally retarded persons. The court concluded that the individual's liberty interests require that the state provide "minimally adequate or reasonable" treatment. *Id.* at 319, 102 S.Ct. at 2460, 73 L.Ed.2d at 39. Several courts have also held that state officials must provide the least stringent practicable alternatives to confinement of noncriminals. *See Stamus v. Leonhardt,* 414 F.Supp. 439 (S.D.Iowa 1976); *see also Eubanks v. Clarke,* 434 F.Supp. 1022 (E.D.Pa.1977); *Davis v. Watkins,* 384 F.Supp. 1196 (N.D.Ohio 1974); *Lessard v. Schmidt,* 349 F.Supp. 1078 (E.D.Wis.1972).

Iowa Code section 229.13 states that a person found to be mentally impaired shall be placed "in a hospital or other suitable facility." Section 229.14 requires the facility's chief medical officer to recommend "an alternative placement" upon finding that the mentally impaired person is unlikely to benefit from further treatment in a hospital. Nowhere in chapter 229 is either "other suitable facility" or "alternative placement" defined.

*Section 229.23 seems to expressly recognize the minimum requirements defined in Youngberg v. Romeo. The statute states that a person shall have the right to "care and treatment as indicated by sound medical practice."*

We hold that the placement authority of a hospitalization referee under sections 229.13 and 229.21 is not necessarily confined to facilities in Iowa. Placement can be ordered elsewhere when adequate treatment cannot be found within Iowa's boundaries. We think it follows that the placement can be ordered at public expense under the same terms and conditions as would be appropriate for placements in Iowa.

A caveat is in order. The scope of this holding is limited in two important ways. It applies only to situations where adequate minimum treatment is not available in Iowa. Secondly, out of concern for the beleaguered taxpayers, out-of-state placements should be ordered only where realistically needed and should not be ordered for the routine care of persons, even those with tragically difficult problems who might be happier or more comfortable elsewhere.

*McCall,* 420 N.W.2d at 803 (emphasis added). Thus, *McCall,* like *Youngberg* and *Hanson,* stands for the proposition that an involuntarily committed person has a substantive right or liberty interest in an appropriate placement, adding that the appropriate placement is the one indicated by "sound medical advice," even if that placement is not available in the State of Iowa.

However, *McCall* cannot be read to recognize a substantive right or liberty interest in placement in a particular institution, although placement at a particular institution had been ordered by the referee in that case. *See id.* at 803 (the referee ordered placement at the Deaf Treatment Center at the Mendota Mental Health Institute in Wisconsin). Rather, the Iowa Supreme Court upheld the placement at issue in *McCall* on the ground that "adequate treatment cannot be found within Iowa's boundaries." *Id.*

Although Iowa Code § 229.23(1), the provision of the Iowa Code that the Iowa Supreme Court found in *McCall* "seems to

expressly recognize the minimum requirements defined in *Youngberg v. Romeo,*" see *McCall,* 420 N.W.2d at 803, was subsequently amended in 1989, the court does not believe that the amendment changes the impact of § 229.23(1), although the amendment does define the "minimum requirements" somewhat differently. At the time of the *McCall* decision, the pertinent subsection read,

> Every person who is hospitalized or detained under this chapter shall have the right to:
> 1. Prompt evaluation, emergency psychiatric services, and care and treatment as indicated by sound medical practice.

IOWA CODE § 229.23(1) (1988). The provision now reads,

> Every person who is hospitalized or detained under this chapter shall have the right to:
> 1. Prompt evaluation, *necessary* psychiatric services, *and additional care and treatment as indicated by the patient's condition.* A comprehensive, individualized treatment plan shall be timely developed following issuance of the court order requiring involuntary hospitalization. *The plan shall be consistent with current standards appropriate to the facility to which the person has been committed and with currently accepted standards for psychiatric treatment of the patient's condition,* including chemotherapy, psychotherapy, counseling and other modalities as may be appropriate.

IOWA CODE § 229.23(1) (1999). Thus, the provision has, *inter alia,* been expanded to require more comprehensive care, not simply *emergency* care, and the phrase "care and treatment as indicated by sound medical practice" has been replaced, first, by the phrase "additional care and treatment as indicated by the patient's condition," with the additional requirement later that "[t]he [treatment] plan shall be consistent ... with currently accepted standards for psychiatric treatment of the patient's condition."

These changes, the court concludes, change the wording, but not the essential requirement, of the statutory provision, leaving it consonant with the *Youngberg* requirement of "minimally adequate or reasonable" treatment. *See McCall,* 420 N.W.2d at 803 (quoting *Youngberg,* 457 U.S. at 319, 102 S.Ct. 2452). However, the substantive right defined by the provision as a whole now appears to be *broader* than the liberty interest defined in *Youngberg.* Such broadening of the substantive right, as defined by the Iowa statute, does not eliminate the statute as the formulation of a substantive right upon which Salcido's procedural due process claim can be based. State law may recognize *more extensive* liberty interests than the Federal Constitution. *See Morgan,* 128 F.3d at 697 ("State law ... may recognize *more extensive* liberty interests than the Federal Constitution [and][t]hese state-created liberty interests are entitled to protection under the Fourteenth Amendment's Due Process Clause.") (emphasis added). Similarly, although IOWA CODE § 229.13 has also been amended since the decision in *McCall* was handed down, the amendment does not change the essential requirement that a committed person be ordered to a hospital or facility "for a complete psychiatric evaluation and appropriate treatment." IOWA CODE § 229.13 (as amended in 1996), *and compare* IOWA CODE § 229.13 (1988) (a person found to be mentally impaired shall be placed "in a hospital or other suitable facility").

#### d. *Salcido's liberty interest*

The court concludes that *Youngberg, Hanson, McCall,* and pertinent provisions of the Iowa Code establish that Salcido has a substantive right or liberty interest in an *appropriate* placement, as the result of his involuntary commitment for a serious mental impairment. *Youngberg* establishes that a person in Salcido's circumstances has a liberty interest in "minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Youngberg,* 457 U.S. at 319, 102 S.Ct. 2452.

*Hanson* recognizes that same liberty interest, but clarifies that neither *Youngberg* nor the Iowa statutory scheme for *voluntarily* committed persons requires the provision of "optimal" treatment. *Hanson*, 867 F.2d at 1120. *McCall* clarifies that the Iowa statutory scheme for *involuntarily* committed persons is consistent with *Youngberg*, in that it establishes the substantive rights of such persons to a placement that can provide appropriate treatment. The present form of the statutes upon which the Iowa Supreme Court relied in *McCall*, this court concludes, still establish a substantive right to "care and treatment as indicated by the patient's condition" and a "[treatment] plan [that is] consistent ... with currently accepted standards for psychiatric treatment of the patient's condition." IOWA CODE § 229.23(1) (1989); IOWA CODE § 229.13 (as amended in 1996) (requiring "complete psychiatric evaluation and appropriate treatment"). Therefore, as a matter of law, Salcido has satisfied the first requirement of his procedural due process claim, identification of a protectable liberty interest in a placement capable of providing "appropriate" treatment. *See, e.g., Stauch*, 212 F.3d at 429; *Hopkins*, 199 F.3d at 975; *Dunham*, 195 F.3d at 1009; *Spitzmiller*, 183 F.3d at 915; *Gordon*, 168 F.3d at 1114.

### 3. *Did Salcido receive the process he was due?*

■ Because Salcido has established, as a matter of law, that he has a protectable liberty interest in a placement capable of providing appropriate treatment, the court turns to the question of whether Salcido received the process to which he was due in order to protect that liberty interest. *Stauch*, 212 F.3d at 431; *Hopkins*, 199 F.3d at 975; *Morgan*, 128 F.3d at 699; *Bliek*, 102 F.3d at 1475. "Due process is a flexible concept and a determination of what process is due ... depends upon the particular circumstances involved." *Bliek*, 102 F.3d at 1475; *accord Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 537 (8th Cir.1999) ("Due process is a flexible

concept, and its procedural protections will vary depending on the particular deprivation involved."). As the Eighth Circuit Court of Appeals has explained,

> To determine what process is due, [courts] balance three factors: first, "the private interest that will be affected by the official action"; second, "the Government's interest"; and third, "the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards."

*Wallin v. Minnesota Dep't of Corrections*, 153 F.3d at 681, 690 (8th Cir.1998) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)); *accord Murray v. Dosal*, 150 F.3d 814, 819 (8th Cir.1998) (citing *Mathews*); *Morgan*, 128 F.3d at 699 (citing *Mathews*); *Parrish*, 133 F.3d at 615 (citing *Mathews*). The court will refer to these factors herein as the "*Mathews* factors." Similarly, in *Youngberg*, the Supreme Court held that the liberty interests of involuntarily committed persons in adequate treatment were not "absolute," such that "whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Youngberg*, 457 U.S. at 321, 102 S.Ct. 2452. Thus, *Youngberg* requires a balancing of factors similar to the *Mathews* factors to determine what due process protections are necessary to protect an involuntarily committed person's liberty interest in appropriate treatment and placement.

"Although, the question of whether procedural safeguards provided ... are adequate to satisfy due process is a question of law for the court to determine, whether the [defendant] indeed provided the [plaintiff] with such procedure is a question of fact for the jury." *Stauch*, 212 F.3d at 431. However, in this case, the parties contend that the questions of the adequacy of procedural safeguards provided and the question of whether the defen-

dants indeed provided Salcido with such procedures can be decided *as a matter of law* in the absence of any genuine issues of material fact.

Salcido contends that the Iowa civil commitment statutes violate the procedural due process rights of an involuntarily committed person on their face, because they require neither a hearing on placement nor determination of placement by an impartial decision-maker when the County refuses to pay for the placement ordered by the hospital referee. This contention is therefore directed at both the County and the State Defendants. Salcido also contends that the County violated his procedural due process rights as a matter of law in the circumstances of his case, *i.e.*, as the procedures were applied, because the County provided neither a hearing nor an impartial decision-maker on appropriate placement in his case.

Assuming Salcido has the necessary liberty interest, the State Defendants contend that Salcido was not erroneously deprived of any such interest, because the commitment procedures under Iowa Code Ch. 229 provide all the process that is due. Similarly, the County contends that the statutory provisions concerning commitment and the available procedures for contesting denials of funding, by Merit under the State's Title XIX program, and by Tri–State under the County's program, provide all the process that is due in the circumstances of this case.

### a. Salcido's interest

In support of his argument that due process requires notice, a hearing, and an impartial decision-maker on placement, Salcido argues that the placement determination is necessarily intertwined with the civil commitment determination itself. Therefore, as to the first *Mathews* factor, "the private interest that will be affected by the official action," *see Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Wallin*, 153 F.3d at 690, Salcido contends that an individual's placement will be of great significance to his private interest, as it impacts directly on his liberty interest in appropriate

treatment. On the other hand, the State Defendants contend that, because the person to be committed is unable to make responsible decisions, the value of any procedures that would allow him or her more input in the placement decision is questionable.

Contrary to the State Defendants' contention, Salcido and other involuntarily committed persons undoubtedly have a very significant interest in the placement determination. It is at this point in the civil commitment process that the interest of the person being committed crosses from the initial interest in liberty implicated by being taken into custody, *see Vitek*, 445 U.S. at 491–92, 100 S.Ct. 1254; *Addington*, 441 U.S. at 425, 99 S.Ct. 1804; *McAllister*, 225 F.3d at 989; *Collins*, 153 F.3d at 596, to the interest identified in *Youngberg, Hanson, McCall*, and the Iowa civil commitment statutes as an interest in adequate treatment. *See, e.g., Youngberg*, 457 U.S. at 319, 102 S.Ct. 2452 (involuntarily committed persons have a liberty interest in minimally adequate treatment); *see also supra*, Section II.B.2.c. Moreover, if the court were troubled by nothing else in this case, it would be troubled by the suggestion of the State Defendants that, because a person is determined to be unable to make responsible decisions, that person has no interest in the determination of his or her placement, and the further suggestion that additional procedures to protect such a person's interest in an appropriate placement would be of no more than questionable value. Operating on the State Defendants' premise, *fewer* procedural protections are due persons least able to protect themselves. Such a premise turns due process on its head.

Fortunately, the Iowa legislature has recognized that persons subject to civil commitment must have counsel available and, if they cannot afford counsel, have counsel appointed for them. *See* Iowa Code § 229.8(1). Appointment of counsel in such cases is obviously intended to protect such persons' interests precisely *be-*

*cause* such persons are unable to protect their own interests, not because their interests evaporate. Furthermore, contrary to the State Defendants' argument, the requirement of counsel for persons subject to involuntary commitment means that any additional procedures—as well as existing procedures—would actually have some meaning in safeguarding the liberty interests of the person being committed. Therefore, persons subject to involuntary commitment have a very significant interest in adequate procedural safeguards in the determination of their placement and there would be benefits to additional safeguards, including notice and a hearing on placement before an impartial decision-maker, if present procedures are inadequate to protect their liberty interest in adequate treatment and placement.

### b. The government's interest

Next, as to the second *Mathews* factor, the government's interest, *see Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Wallin*, 153 F.3d at 690, Salcido argues that neither the County nor the State Defendants have a significant interest that outweighs his own interest in notice and a hearing on placement before an impartial decision-maker, because the burden on these defendants to modify procedures to conform to due process requirements would be slight. The State Defendants, however, contend that the government's interest in the placement of persons subject to civil commitment is significant, because of the substantial costs of mental health care borne by the state and the counties, while permitting individuals to designate where services would be received would thwart any government interest in controlling mental health care costs.

Although the court acknowledges the government's interest in controlling mental health care costs, the court notes, first, that the Iowa legislature has already unequivocally demonstrated that the public has an interest in involuntary commitment and appropriate treatment of persons who pose a threat to themselves or others by enacting IOWA CODE CH. 229. Thus, the cost of care for such individuals is not a government interest that is sufficient to outweigh the individual's interest in procedural protections on an appropriate placement.

Moreover, the State Defendants once again misconstrue Salcido's contentions: He is not asserting that procedural safeguards, such as notice and a hearing before an impartial decision-maker, must allow him or other involuntarily committed persons to designate where services would be received—indeed, such a contention would appear to be foreclosed by the decision in *Hanson* that committed persons are not entitled to "optimal" treatment. *See Hanson*, 867 F.2d at 1120. Rather, Salcido is asserting that adequate procedural safeguards must permit him to be heard before an impartial decision-maker in the process that determines an appropriate placement, and certainly must permit him to be heard in the circumstances where the county responsible for paying for his care refuses to authorize or pay for an appropriate placement. The State Defendants have pointed to no government interest that touches on or outweighs Salcido's interest in notice and a hearing on placement before an impartial decision-maker to safeguard his liberty interest in an appropriate placement.

### c. Risk of erroneous deprivation

The court therefore turns to the third *Mathews* factor, the risk of an erroneous deprivation in the absence of notice, hearing, and an impartial decision-maker regarding placement. *See Mathews*, 424 U.S. at 335, 96 S.Ct. 893; *Wallin*, 153 F.3d at 690. This factor is the most contentious of the three in this case and requires the most painstaking analysis.

*i. Arguments of the parties.* As to this factor, Salcido contends that the risk of an erroneous deprivation under the present Iowa statutory scheme is substantial, because the statutory scheme requires that an individual be committed to a facility designated through the county's single entry point process, but the Iowa Code

provides no procedures for resolving placement disputes if a county responsible for costs of treatment refuses, through the single entry point process, to fund or approve the placement recommended by mental health professionals and ordered by the hospital referee.[6] Salcido points out that there are no additional procedures within the statutory scheme for notice or hearing before any decision-maker for a respondent or his counsel to contest determinations made by the single entry point process to deny services to involuntarily committed persons.

On the other hand, the State Defendants contend that the risk of an erroneous deprivation is minimal, because a disinterested physician is charged with evaluating the committed person's mental condition and reporting to the referee with a recommendation for an appropriate placement. The State Defendants point out that Salcido is not arguing that the physician in this case made an erroneous determination of the appropriate level of care and placement in his case; rather, the State Defendants contend that the flaw in the system that Salcido has identified was the County's refusal to follow the statutory provisions by approving and funding an appropriate placement.

The County echoes the State Defendants' arguments to the extent that the County contends that the statutory framework for involuntary commitment provides all the procedural safeguards necessary to protect Salcido from deprivation of his liberty interest. The County points out that, in addition to the statutory provisions, grievance procedures were available to Salcido concerning denial of placement at CMHI in this case for both Merit's denial of state Title XIX funding—which the County contends Salcido did not exhaust—and the County's denial of funds through Tri–State, including, in the latter case, "appeal" to the County Board of Supervi-

sors. The problem, the County contends, is that the hospital referee failed to make a placement that conformed to the single entry point process determination, as required by statute, and, more importantly, that Salcido was not qualified for any placement under the single entry point process and the County's plan.

To the extent the defendants argue that the procedures for initial commitment of persons provide all the process due to protect their liberty interests, that contention again goes to the "wrong" liberty interest. As the Supreme Court explained in *Youngberg*, "[t]he mere fact that [the person committed] has been committed under proper procedures does not deprive him of all substantive liberty interests under the Fourteenth Amendment." *Youngberg*, 457 U.S. at 315, 102 S.Ct. 2452. Rather, the Court concluded that, "[i]n the circumstances presented by this case, and on the basis of the record developed to date, we ... conclude that respondent's liberty interests require the State to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint." *Id.* at 319, 102 S.Ct. 2452. Thus, the proper question is whether the Iowa statutory scheme and the grievance procedures to which the County points provide adequate procedural safeguards for a committed person's *further* liberty interest in adequate treatment and placement.

ii. *The statutory scheme for involuntary commitment.* Prior to the oral arguments on the motions for summary judgment, the State Defendants submitted a supplemental exhibit, State's Exhibit A, consisting of flow charts showing the process for provision of services to mentally ill persons pursuant to the Iowa Code of 1997. That exhibit was admitted into evidence, with the agreement of the parties, at the oral arguments. The portion of the

---

**6.** Salcido contends that the same due process deficiencies would exist if the County designated a different placement from that ordered by the referee and recommended by mental health professionals, although he acknowl-

edges that such circumstances are not now before the court, because the County simply denied any placement at all for Salcido, rather than permitting only a different placement from the one ordered by the referee.

exhibit indicating the process for non-emergency involuntary commitment, the process relevant here, is reproduced below.

### Process for MI Client
### To Seek/Receive Services
### Pursuant to 1997 Iowa Code

Involuntary Hospitalization (commitment) where costs are paid in whole or in part with County Funds

State's Exhibit A (partial). In this chart, "SEP" stands for "single entry point process," "CMO" stands for "chief medical officer," and "SMI" stands for "seriously mentally impaired," as those terms are used in the pertinent provisions of the Iowa Code. The "single entry point process" referred to is the method whereby counties manage services for the mentally ill, see Iowa Code §§ 331.439 & 331.440,[7] for example, when a county is responsible for the expenses of a person committed pursuant to Iowa Code Ch. 229. See Iowa Code § 229.1B ("Notwithstanding any provision of this chapter to the contrary, any person whose hospitalization expenses are

---

7. To the extent the "single entry point process" involves a process involving a "central point coordinator," the processes are treated here as identical and will be referred to only by the former term.

payable in whole or in part by a county shall be subject to all requirements of the single entry point process."); *see also* IOWA CODE § 230.1 ("A county of legal settlement is not liable for costs and expenses associated with a person with mental illness unless the costs and expenses are for services and other support authorized for the person through the single entry point process.") (also identifying the "single entry point process" as the same one defined in IOWA CODE § 331.440).

Helpful as it is, the court finds that the flow chart requires some explanation and amplification. As the flow chart indicates, the process of "involuntary hospitalization" begins with an application pursuant to IOWA CODE § 229.6. The application must state the applicant's belief that "the respondent" is "seriously mentally impaired," state any other pertinent facts, and be accompanied by "a written statement of a licensed physician in support of the application," or one or more corroborating affidavits, or other corroborative information reduced to writing. IOWA CODE § 229.6. If the referee determines that the application for "involuntary hospitalization" pursuant to IOWA CODE § 229.6 is "adequate as to form, the court may set a time and place for a hearing on the application, if feasible, but the hearing shall not be held less than forty-eight hours after notice to the respondent unless the respondent waives such minimum prior notice requirement." IOWA CODE § 229.7. Section 229.7 also provides that, "[i]f the respondent is taken into custody under section 229.11, service of the application, documentation and notice upon the respondent shall be made at the time the respondent is taken into custody." *Id.* Thus, § 229.7 requires notice to the respondent of the application whether or not the respondent is taken into immediate custody.

Section 229.8, which is not mentioned in the flow chart, provides for the selection or appointment of counsel to represent the person to be committed, that is, the respondent, and notice of the application for commitment to the county attorney for review. IOWA CODE § 229.8(1) & (2). This provision also requires that, if not previously done, *i.e.,* pursuant to § 229.7, the referee "shall ... set a time and place for a hospitalization hearing, which shall be at the earliest practicable time not less than forty-eight hours after notice to the respondent, unless the respondent waives such minimum prior notice requirement." IOWA CODE § 229.8(3)(a). Finally, this provision requires the referee to "[o]rder an examination of the respondent, prior to the hearing, by one or more licensed physicians who shall submit a written report on the examination to the court as required by section 229.10." IOWA CODE § 229.8(3)(b).

Section 229.9, which is not mentioned in the flow chart, provides for notice to the respondent's attorney of the application for commitment and orders issued by the referee pursuant to §§ 229.8 and 229.11. Section 229.10, which also is not mentioned in the flow chart, states various requirements for the physician's examination that the referee must order pursuant to § 229.8(3)(b). Specifically, § 229.10(1) provides the timing of such examination, depending upon whether and in what manner the respondent is held in custody; entitles the respondent to a separate examination by a physician of the respondent's own choosing; permits the examining physician to consult with or request the participation of any qualified mental health professional and to take into account the findings of such a mental health professional; and permits the referee to compel a respondent not already in custody to submit to the examination. IOWA CODE § 229.10(1). Subsection (2) of § 229.10 requires the filing of a written report on the physician's examination and the sending of copies of the report to the referee and the respondent's attorney. IOWA CODE § 229.10(2). Subsection (3) permits the referee to terminate the proceedings if the examining physician's report is to the effect that the individual is not seriously mentally impaired. IOWA CODE § 229.10(3). However, if the report is to the effect that the individual is seriously

mentally impaired, subsection (4) requires the referee to set a hospitalization hearing, and provides for the timing of such a hearing. Iowa Code § 229.10(4).

The flow chart requires some clarification as to procedures in the event the respondent is ordered to be taken into immediate custody pursuant to Iowa Code § 229.11. Immediate custody is permitted if the referee finds probable cause to believe, based on the application and accompanying documentation, "that the respondent has a serious mental impairment and is likely to injure the respondent or other persons if allowed to remain at liberty." Iowa Code § 229.11 (unnumbered first paragraph). In such a case, the timing of the hospitalization hearing is specified by this section. *Id.* To clarify the flow chart, this section provides that, "[i]f the expenses of a respondent are payable in whole or in part by a county, for a placement in accordance with subsection 1 ["custody of a relative, friend, or suitable person"], the judge shall *give notice* of the placement to the single entry point process, and for a placement in accordance with subsection 2 ["suitable hospital"] or 3 [nearest facility licensed to care for the mentally ill], the judge shall order the placement in a hospital or facility *designated* through the single entry point process." *Id.* (emphasis added).

As the flow chart indicates, a hearing to determine serious mental impairment is the next step in the procedure. The statute defining the hearing *procedure* describes this hearing as a "hospitalization hearing." Iowa Code § 229.12(1). The *determination* to be made at the "hospitalization hearing" and consequent orders, however, are defined by Iowa Code § 229.13, which provides in pertinent part as follows:

> If upon completion of the hearing the court finds that the contention that the respondent has a serious mental impairment is sustained by clear and convincing evidence, *the court shall order a respondent whose expenses are payable in whole or in part by a county committed to the care of a hospital or facility*

*designated through the single entry point process* ... as expeditiously as possible for a complete psychiatric evaluation and appropriate treatment.

Iowa Code § 229.13 (first unnumbered paragraph) (emphasis added). Further, this provision imposes certain obligations on the chief medical officer of the facility to which the respondent is initially committed following the "hospitalization hearing":

> The chief medical officer of the hospital or facility shall report to the court no more than fifteen days after the individual is admitted to or placed under the care of the hospital or facility, *making a recommendation for disposition of the matter.*

Iowa Code § 229.13 (second unnumbered paragraph). Thus, § 229.13 provides only for the initial "hospitalization" placement, and requires a report on ultimate placement of the respondent or disposition of the commitment case, but does not provide for the ultimate placement or disposition. This section provides that the chief medical officer's report "shall be sent to the respondent's attorney, who may contest the need for an extension of time if one is requested." *Id.*

The final placement of the individual is determined based on the chief medical officer's report, which is required by § 229.13, but further defined by § 229.14. "The report shall state one of the four following alternative findings": (1) "[t]hat the respondent does not, as of the date of the report, require further treatment for a serious mental impairment"; (2) "[t]hat the respondent is seriously mentally impaired and in need of full-time custody, care and treatment in a hospital, and is considered likely to benefit from treatment"; (3) "[t]hat the respondent is seriously mentally impaired and in need of treatment, but does not require full-time hospitalization"; or (4) that "[t]he respondent is seriously mentally impaired and in need of full-time custody and care, but is unlikely to benefit from further treatment

in a hospital." IOWA CODE § 229.14. For each alternative, the statute provides the appropriate order to be entered by the referee. *Id.* In the case of the fourth alternative, the one pertinent here, the statute provides as follows:

> If the report so states, the chief medical officer shall recommend an alternative placement for the respondent and the court shall enter an order which may direct the respondent's transfer to the recommended placement.... If the court or the respondent's attorney considers the placement inappropriate, an alternative placement may be arranged upon consultation with the chief medical officer and approval of the court.

IOWA CODE § 229.14(4). Thus, the ultimate placement of the committed person, as contemplated by IOWA CODE CH. 229, is made by the referee on the basis of the "alternative" indicated in the chief medical officer's report and, possibly, on the basis of "consultation" between the referee, the respondent's attorney, and the chief medical officer. *Id.* Although the provisions providing for the immediate custody of the respondent, IOWA CODE § 229.11, and for initial placement after the determination of "serious mental impairment" in the "hospitalization hearing," IOWA CODE § 229.13, were amended in 1996 to require placement of persons whose expenses will be paid by the county to a facility "designated through the single entry point process," no such amendment was made to § 229.14, the provision providing for the ultimate placement of the committed person upon the chief medical officer's recommendation. *See* IOWA CODE § 229.14. Nevertheless, ultimate placement pursuant to § 229.14 is still subject to the requirements of the "single entry point system," by virtue of § 229.1B, which provides that, "[n]otwithstanding any provision of this chapter to the contrary, any person whose hospitalization expenses are payable in whole or in part by a county shall be subject to all requirements of the single entry point process." IOWA CODE § 229.1B; *see also* IOWA CODE § 230.1 ("A county of legal settlement is not liable for costs and expenses associated with a person with mental illness unless the costs and expenses are for services and other support authorized for the person through the single entry point process.").

The court has tarried over these details of the commitment process, because they are pertinent to the determination of whether IOWA CODE CH. 229 provides due process on its face to protect an involuntarily committed person's liberty interest in an appropriate placement and to the question of whether Salcido received the process he was due as a matter of fact. *See Stauch,* 212 F.3d at 431 ("Although, the question of whether the procedural safeguards provided ... are adequate to satisfy due process is a question of law for the court to determine, whether the [defendant] indeed provided the [plaintiff] with such procedure is a question of fact for the jury.").

***iii. Adequacy of the notice, hearing, and decision-maker provisions on their face.*** The Eighth Circuit Court of Appeals has observed that, "[i]n applying the *Mathews v. Eldridge* balancing analysis, the Supreme Court has generally held that the Due Process Clause requires some kind of a hearing before the state may deprive a person of liberty or property." *Gentry v. City of Lee's Summit, Mo.,* 10 F.3d 1340, 1344 (8th Cir.1993) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), which required a hearing before termination of employment, *Memphis Light, Gas & Water Div. v. Craft,* 436 U.S. 1, 18, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), which required a hearing before cutting off utility service, and *Fuentes v. Shevin,* 407 U.S. 67, 80–84, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), which required a hearing before issuance of a writ allowing repossession of property). Indeed, more recently, the Eighth Circuit Court of Appeals has stated, "An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing

that is appropriate to the nature of the case." *Stauch,* 212 F.3d at 430 (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985)); *Bliek,* 102 F.3d at 1475 ("In determining what process is due in this circumstance, we note that the need for an *adequate* notice is also settled law. Adequate notice is integral to the due process right to a fair hearing, for the 'right to be heard has little reality or worth unless one is informed.' ") (emphasis in the original; quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950)). Moreover, "[t]he right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner." *Stauch,* 212 F.3d at 430 (internal citations and quotation marks omitted). A *post-deprivation* hearing may suffice, if, under the *Mathews* balancing test, the state's interest in urgent action outweighs the private interest in a pre-deprivation hearing, and the risk of an erroneous deprivation is relatively low. *See Wallin,* 153 F.3d at 691. Similarly, " '[i]n general, due process requires that a hearing before *an impartial decisionmaker* be provided at a meaningful time, and in a meaningful manner.' " *Johnson,* 172 F.3d at 537 (quoting *Coleman v. Watt,* 40 F.3d 255, 260 (8th Cir.1994)) (emphasis added); *Gordon v. Hansen,* 168 F.3d 1109, 1114 (8th Cir. 1999).

The State Defendants are correct that the Iowa Code provides that the appropriate placement of an involuntarily committed person is supposed to be made following evaluation and recommendation by a qualified mental health care professional. *See* IOWA CODE §§ 229.10 (providing for an examination of the respondent by one or more licensed physicians who must file a written report concerning whether the respondent is seriously mentally impaired), 229.13 (following the determination of serious mental impairment, the referee is to order further evaluation by the chief medical officer of the facility to which the person is initially committed at the "hospitalization hearing"), 229.14 (providing four alternative findings to be made by the chief medical officer upon further evaluation of the person committed regarding ultimate placement). However, nothing in the Iowa Code requires a further hearing on the placement recommendation, *see* IOWA CODE § 229.14, and the bottom tier of Exhibit A above. Rather, pursuant to IOWA CODE § 229.14(4), if the chief medical officer who evaluates the committed person after commitment concludes that the person "is seriously mentally impaired and in need of full-time custody and care, but is unlikely to benefit from further treatment in a hospital," the chief medical officer "shall recommend an alternative placement for the respondent and the court shall enter an order which may direct the respondent's transfer to the recommended placement," and "[i]f the court or the respondent's attorney considers the placement inappropriate, an alternative placement may be arranged upon consultation with the chief medical officer and approval of the court." Section 229.14(4) thus does not mandate notice and a hearing as a procedural safeguard for the liberty interest in appropriate placement, but instead places the onus on the committed person's attorney to object to an inappropriate placement, which "may" result in an alternative placement after "consultation." This provision should be contrasted with § 229.7, which mandates service of a notice upon the person to be involuntarily committed of the application for involuntary commitment and of the time and place for the initial "hospitalization" hearing, which procedural safeguards protect the person's initial liberty interest in light of the possibility of impending custody. *See* IOWA CODE § 229.7.

Moreover, there is no hearing procedure of any sort mandated by the Iowa Code if the county responsible for paying for the committed person's placement refuses to pay for that placement. Although the placement recommendation is in the hands of the "chief medical officer" of the hospitalization facility, and is decided by the hospitalization referee, *see* IOWA CODE

§ 229.14(4), section 229.1B does require that the ultimate placement be pursuant to the "single entry point process" if a county is to foot the bill. IOWA CODE § 229.1B; *see also* IOWA CODE § 230.1 (a county is only responsible for costs of commitment if the services were authorized through the single entry point process). This "funding" limitation effectively places the ultimate placement decision with the single entry point system, but there are no provisions in the code for a hearing on the decision dictated by the single entry point system. Although the recommendation as to ultimate placement is to be made by the chief medical officer of a facility designated for initial hospitalization by the single entry point system, *see* IOWA CODE § 229.13, that requirement does not indicate in what way a county's single entry point system is to have input into the determination of the committed person's ultimate placement, or in what way a respondent is to be heard on the placement. Certainly, there is no provision for a hearing on a county's "veto" of a placement determination made by the referee on the chief medical officer's recommendation pursuant to IOWA CODE § 229.14.

Thus, there is a very serious risk of an erroneous deprivation of an involuntarily committed person's liberty interest in an appropriate placement, despite the strength of the individual's interest in adequate due process protections and the lack of any substantial contrary interest on the part of the government. *See Mathews,* 424 U.S. at 335, 96 S.Ct. 893; *Wallin,* 153 F.3d at 690; *see also Youngberg,* 457 U.S. at 321, 102 S.Ct. 2452 ("whether respondent's constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests"). Therefore, as a matter of law, Iowa's statutory provisions fail to provide any notice or hearing that addresses the denial by a county, through its single entry point system, of an involuntarily committed person's liberty interest in an appropriate placement. *See Stauch,* 212 F.3d at 431 ("the question of whether the procedural safeguards provided ... are adequate to satisfy due process is a question of law for the court to determine").

Nor are the additional grievance procedures identified by the County sufficient to overcome the procedural inadequacies of the statutory system. First, any grievance procedures concerning state Title XIX funding are irrelevant, because whether or not a county is responsible for funding mental health services for a person under involuntary commitment is not determined, under the statutory system in place in 1998, by whether or not state funds were available, but on the basis of whether or not the county was the committed person's "county of legal settlement." *See* IOWA CODE § 230.1 ("The necessary and legal costs and expenses attending the taking into custody, care, investigation, admission, commitment, and support of a person with mental illness admitted or committed to a state hospital shall be paid ... [b]y the county in which such person has a legal settlement, or ... [b]y the state when such person has no legal settlement in this state, or when such settlement is unknown."). There is no dispute here that Woodbury County is, and was at all relevant times, Salcido's county of legal settlement. Second, the grievance procedures provided by Tri–State upon denial of services under the County's plan cannot satisfy due process requirements on their face, because Tri–State only provides procedures for appeal if someone is denied services after a voluntary application. There are no such procedures for notifying individuals who are in the involuntary commitment process that an ultimate placement pursuant to IOWA CODE § 229.14 will not be funded or approved. *See* Plaintiff's Documents In Support of Motion For Summary Judgment at 45 (Woodbury County Mental Health Services management Plan, May 1, 1996 (approved by IDHS 12/7/98), § 8, ¶ 2) (providing that "[w]hen *an individual requests* funding for services," but such services are denied, the individual shall be advised of the right to appeal, but providing no appeal procedures for an involuntarily committed person or denial of judi-

cially ordered services) (emphasis added). Thus, the grievance procedures provided by the County also fail to provide adequate process to protect Salcido's liberty interest in adequate placement as a matter of law. *Stauch*, 212 F.3d at 431. The absence of any notice and hearing procedures on placement necessarily establishes that there is no provision on the face of the procedures for an impartial decision-maker on placement, either.

*iv. Adequacy of the notice and hearing procedures actually provided.* The court therefore turns to what is ordinarily a question for the jury, whether the procedures actually provided to Salcido were sufficient to provide due process safeguards on his liberty interest in an appropriate placement. *See id.* ("[W]hether the [defendant] indeed provided the [plaintiff] with such procedure is a question of fact for the jury."). The court must " 'look more closely at the procedures [the plaintiff] actually received, to see if they adequately protected him against the risk of an erroneous deprivation of his [protected] interest.' " *Wallin*, 153 F.3d at 691 (quoting *Ibarra v. Martin*, 143 F.3d 286, 290 (7th Cir.1998)).

The State Defendants contend that the flaw in the system that Salcido has identified was the County's refusal to follow the statutory provisions by approving and funding an appropriate placement. At oral arguments, the State Defendants contended that the statutes in question permit the County to "designate" Salcido's placement pursuant to the single entry point system, but do not permit the County to refuse to provide such services, citing, *e.g.*, the "designation" language in IOWA CODE §§ 229.11, and 229.13. Thus, it would appear that the State Defendants' are arguing that any procedural shortcomings in the statutory system regarding notice, hearing, and an impartial decision-maker on the question of ultimate placement were not the impediment in Salcido's case, and hence no due process violation is actually attributable to the State Defendants.

However, as a matter of law, it is precisely at the point where § 229.14 provides inadequate procedural safeguards concerning ultimate placement that the process broke down in this case. The application for Salcido's involuntary commitment pursuant to IOWA CODE § 229.6 was filed on July 9, 1998. *See* flow chart, *supra* at page 920. The referee ordered Salcido taken into immediate custody at Marian Hospital pursuant to IOWA CODE § 229.11. No party has asserted that Marian Hospital was not the facility "designated" under the County's single entry point system for immediate custody as required by IOWA CODE § 229.11. However, at Salcido's "hospitalization hearing" pursuant to IOWA CODE § 229.12 on July 15, 1998, the referee not only read Dr. Muller's evaluation as satisfying the requirements of IOWA CODE § 229.10—concerning the licensed physician's report, following examination, on whether Salcido was seriously mentally impaired and subject to initial "hospitalization"—but also apparently considered Dr. Muller's report as satisfying the requirements of IOWA CODE § 229.14—which requires a report of the chief medical officer of the "hospitalization" facility concerning ultimate disposition. This is so, because both the referee's "Findings of Fact Pursuant to Iowa Code Section 229.13," which found Salcido seriously mentally impaired and noted that Dr. Muller had recommended residential treatment, *see* Plaintiff's Documents at 10, and the referee's "Order After Evaluation Pursuant To Iowa Code Section 229.14," which noted that Dr. Muller found Salcido to be seriously mentally impaired, but no longer in need of acute in-patient treatment, and ordered Salcido held at Marian Health Center pending transfer to CMHI, *see* Plaintiff's Documents at 11, are dated July 15, 1998. The statutory scheme provided no notice, hearing, or impartial decision-maker regarding Salcido's ultimate placement, and the referee held no such hearing when the County refused to permit the placement. Although it is unlikely that the delay between the hospitalization hear-

ing and the ultimate placement recommendation contemplated by Iowa Code § 229.13 would have made any difference in this case, in light of the County's position, the "telescoping" of the "hospitalization" determination and the ultimate placement determination in this case provided no opportunity for either the examining physician or the referee to determine what ultimate placement was available under the County's single entry point system. Thus, the flaw in the statutory scheme actually was responsible for the denial of Salcido's due process rights to notice and a hearing on denial of an appropriate placement.

■ For its part, the County contends that Salcido actually *had* an adequate hearing on the denial of his placement at CMHI, because the County acquiesced in and even expedited Dr. Muller's "appeal" of the denial of that placement. The County contends further that Salcido received the due process protection of an impartial decision-maker, because his "appeal" was heard by the Woodbury County Board of Supervisors. Salcido contends that any hearing on ultimate placement that he received was tainted by the lack of an impartial decision-maker, because the Board of Supervisors is responsible for funding mental health services and therefore cannot be impartial in determining who should receive such funds. The court will assume, for the sake of argument, that *if* the Board of Supervisors is an impartial decision-maker, Salcido actually received, or there are genuine issues of material fact as to whether he received, an adequate notice and hearing on the County's denial of his placement at a facility capable of providing adequate treatment.

*v. Impartiality of the decision-maker.* "While the Due Process Clause requires a tribunal to be fair and impartial, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242, 100 S.Ct. 1610, 1613, 64 L.Ed.2d 182 (1980), the Supreme Court has stated that an adjudicator's slight pecuniary interest in the outcome of the proceedings does not in itself violate due process." *Marler v.*

*Missouri Bd. of Optometry*, 102 F.3d 1453, 1457 (8th Cir.1996) (citing *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825–26, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986)). Nor does the combination of investigatory and adjudicatory functions necessarily require a conclusion that a tribunal is biased. *See Gordon*, 168 F.3d at 1114. Rather, " '[w]e begin with a presumption that decision-makers are honest and impartial.' " *Gordon*, 168 F.3d at 1114. That presumption can be overcome only by a showing that the adjudicator had such an interest as "might lead him not to hold the balance [between the parties] nice, clear and true." *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *Yamaha Motor Corp. v. Riney*, 21 F.3d 793, 798 (8th Cir. 1994) (quoting *Tumey*); *see also Ward v. Monroeville*, 409 U.S. 57, 59, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) (the presumption may be overcome where the " 'judge ... has a direct, personal, substantial pecuniary interest in reaching a conclusion against [a party] in his case' ") (quoting *Tumey*, 273 U.S. at 523, 47 S.Ct. 437).

Notwithstanding the presumption that a tribunal is fair, Salcido contends that the question of the impartiality of the decision-maker in this case, the Board of Supervisors, is controlled or guided by the Supreme Court's decision in *Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972). In *Ward*, the petitioner contested, on due process grounds, a provision of the Ohio Code that authorized mayors to sit as judges in cases of ordinance violations and certain traffic offenses. *Ward*, 409 U.S. at 57, 93 S.Ct. 80. The petitioner had been convicted by the mayor of Monroeville, Ohio, of two traffic offenses and fined $50 on each offense. *Id.* "Conceding that 'the revenue produced from a mayor's court provides a substantial portion of a municipality's funds,' the Supreme Court of Ohio held nonetheless that 'such fact does not mean that a mayor's impartiality is so diminished thereby that he cannot act in a disinterested fashion in a judicial capacity.' " *Id.* at 59, 93

S.Ct. 80. The United States Supreme Court, however, disagreed. *Id.*

The United States Supreme Court concluded that the issue turned on whether the mayor can be regarded as an impartial judge under principles the Court had laid down in *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927):

> There, convictions for prohibition law violations rendered by the Mayor of North College Hill, Ohio, were reversed when it appeared that, in addition to his regular salary, the Mayor received $696.35 from the fees and costs levied by him against alleged violators. This Court held that 'it certainly violates the Fourteenth Amendment and deprives a defendant in a criminal case of due process of law to subject his liberty or property to the judgment of a court, the judge of which has a direct, personal, substantial pecuniary interest in reaching a conclusion against him in his case.'

*Id.,* at 523, 47 S.Ct., at 441.

The fact that the mayor there shared directly in the fees and costs did not define the limits of the principle. Although "the mere union of the executive power and the judicial power in him cannot be said to violate due process of law," *id.,* at 534, 47 S.Ct., at 445 the test is whether the mayor's situation is one "which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused...." *Id.,* at 532, 47 S.Ct., at 444. Plainly that "possible temptation" may also exist when the mayor's executive responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court. This, too, is a "situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) necessarily involves a lack of due process of law in the trial of defendants charged with crimes before him." *Id.,* at 534, 47 S.Ct., at 445.

*Ward,* 409 U.S. at 59–60, 93 S.Ct. 80. The Supreme Court rejected the sufficiency of purported additional safeguards, including the opportunity to assert the bias of the mayor in separate proceedings, and the availability of an appeals process. *Id.* at 61, 93 S.Ct. 80. The Court noted that "there is nothing to suggest that the incentive to convict would be diminished by the possibility of reversal on appeal," nor is the eventual offer of an impartial adjudication adequate. *Id.* Rather, a person is "entitled to a neutral and detached judge in the first instance." *Id.* at 61–62, 93 S.Ct. 80.

Salcido argues that his interest is greater than that of the petitioner in *Ward,* since the denial of an adequate placement in his case deprives him completely of his liberty interest in adequate treatment, as compared to the imposition of fines for traffic violations in *Ward,* while the County Board's pecuniary interest is as substantial as the mayor's in *Ward,* albeit of a somewhat different kind, because mental health services constitute approximately 21% of the County's budget, which is set by the Board. Thus, Salcido contends, the persons making the determination on placement are motivated to limit the County's financial responsibility for civilly committed persons. The County, however, contends that there are genuine issues of material fact as to impartiality where none of the Board members had the sort of direct, pecuniary interest displayed by one of the decision-makers in *Yamaha Motor Corp. v. Riney,* 21 F.3d 793, 798 (8th Cir. 1994), and none served as both an investigator and adjudicator or had other personal involvement in the case, citing *Malek v. Laurie Smith Camp,* 822 F.2d 812, 816 (8th Cir.1987). The County also contends that no reasonable inference of pecuniary interest can be drawn in this case, because the Board based its decision on three objective factors: (1) Salcido's primary diagnosis is dementia, which is excluded from the definition of mental illness in the County's Management Plan, and the County's Management Plan had been approved

by the Iowa Department of Human Services; (2) the Board "conceived of the County's Management Plan as the provision of services of last resort," while Salcido, as a recipient of Title XIX funds, had not exhausted his appeal rights defined in the contract between the IDHS and Merit; and (3) the County's Management Plan then in place, and made effective retroactively to July 1, 1998, "does not provide long-term residential care services for any member of the MI/CMI [Mentally Ill/Chronically Mentally Ill] population." Plaintiff's Documents in Support of Motion for Summary Judgment at 38–39; *see also* Woodbury County's Combined Resistance To Plaintiff's Motion For Summary Judgment and Brief In Support [Of] Motion For Summary Judgment By Woodbury County, Iowa (County's Brief) at 8–9.

First, the court concludes that *Ward* is determinative. The court agrees with the County that there is no indication of any personal involvement in the investigation of Salcido's case on the part of any member of the decision-making body here, as there was in *Malek*, 822 F.2d at 816. Nor is there any indication of the sort of personal pecuniary interest displayed in *Riney*, 21 F.3d at 797–98. In *Riney*, the Eighth Circuit Court of Appeals held that the district court's finding of no evidence of bias was clearly erroneous, after applying the *Tumey/Ward* test of "whether the adjudicator's situation might lead him not to hold the balance [between the parties] nice, clear and true,'" where one member of the state motor vehicle commission hearing a claim that a Yamaha dealer agreement failed to comply with state law regarding dealership contracts was a Harley Davidson dealer with "a pecuniary interest in eradicating Yamaha from the State of Arkansas," and other evidence indicated he had "abdicated his role as an adjudicator and had prejudged the issues before him." *Riney*, 21 F.3d at 798. Such circumstances are not presented here.

Nevertheless, *Ward* stands for the proposition that a personal pecuniary interest of a particular decision-maker is not required to offend due process. *See Ward,*

409 U.S. at 60, 93 S.Ct. 80 ("The fact that the mayor [in *Tumey* ] shared directly in the fees and costs did not define the limits of the principle."). Rather, the Court in *Ward* formulated the test as "whether the [decision-maker's] situation is one 'which would offer a possible temptation to the average man as a judge to forget the burden of proof required ... or might lead him not to hold the balance nice, clear and true between [the parties].'" *Id.* (quoting *Tumey,* 273 U.S. at 532, 47 S.Ct. 437). Even more specifically, the Court held that "[p]lainly that 'possible temptation' may also exist when the mayor's responsibilities for village finances may make him partisan to maintain the high level of contribution from the mayor's court." *Id.* Thus, the test of bias, as defined and applied in *Ward,* does not consider just whether there was a personal pecuniary interest of the decision-maker or any individual member of the decision-making body. Rather, the test in *Ward* also considers whether institutional concerns of the entity overseen by the decision-maker would pose a "possible temptation" to the decision-maker to disregard proper standards for the decision and instead decide on some other basis, such as institutional finances. *See id.; see also DePiero v. City of Macedonia,* 180 F.3d 770, 778 (6th Cir.1999) (stating, "Although direct personal pecuniary interest of a mayor in a result of his judgment is arguably one of the most flagrant forms of bias, it is not the only reason for holding that due process is denied," and concluding that *Tumey* and *Ward* both stand for the proposition that the decision-maker's interest in financial needs of a municipality of which he is an executive officer may fail the "possible temptation" test), *cert. denied,* 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000); *Alpha Epsilon Phi Tau Chapter Housing Ass'n v. City of Berkeley,* 114 F.3d 840, 843 (9th Cir.1997) (adopting the district court's characterization of *Ward* as holding that due process is offended "where decision-makers have an institutional financial interest that may lead them

to make biased decisions"); *Doolin Sec. Sav. Bank, F.S.B. v. F.D.I.C.*, 53 F.3d 1395, 1406 (4th Cir.1995) (noting that "[t]he Supreme Court has held that institutional pecuniary interests rendered the adjudicator unconstitutionally biased," citing *Ward*), *cert. denied,* 516 U.S. 973, 116 S.Ct. 473, 133 L.Ed.2d 402 (1995).

Second, although *Ward* involved the exercise of judicial functions that were likely to produce substantial *income* for the municipality by a municipal executive with "responsibilities for village finances," *see Ward,* 409 U.S. at 60, 93 S.Ct. 80, and the present circumstances involve the exercise by the executives responsible for the County's finances of judicial functions that were likely to involve substantial *outlays* from the County coffers, the situations are nonetheless analogous. There is undoubtedly the same "possible temptation" here that the County Board's responsibilities for the County budget—and more specifically, responsibilities for the County's mental health budget, which forms a very substantial part of County's entire budget—"may also exist when the [Board's] executive responsibilities for [County] finances may make [them] partisan to maintain" a low level of expenditures for mental health services or not to burden the mental health budget with the costs of services in a particular case. *Cf. Ward,* 409 U.S. at 60, 93 S.Ct. 80. "This, too, is a 'situation in which [the County Board] perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, (and) *necessarily* involves a lack of due process of law in the [consideration of an appeal of the denial of mental health services].'" *Id.* (quoting *Tumey,* 273 U.S. at 534, 47 S.Ct. 437) (emphasis added); *accord Meyer v. Niles Township,* 477 F.Supp. 357, 362 (N.D.Ill.1979) (holding that township supervisors cannot impartially adjudicate claims for benefits and supervise funds out of which benefits are paid). To the extent the "appeal" of single entry point determinations to the County Board was dictated by a provision of the Iowa Administrative Code, *see* 441 IOWA ADMIN. CODE § 25.13(2)(j), that administrative directive also constitutes a violation of due process in the case of determinations of placement for involuntary commitments.

Finally, the court concludes that it need not consider whether the "objective" foundations for the County's denial of services in Salcido's case generate genuine issues of material fact as to the impartiality of the Board, where *Ward* holds that the position of decision-makers as judges and partisans in analogous circumstances *necessarily* violated due process, not merely that the circumstances gave rise to a rebuttable presumption of partiality. *See Ward,* 409 U.S. at 60, 93 S.Ct. 80. Nevertheless, in the alternative, assuming that only a rebuttable presumption of partiality is established by the circumstances identified in *Ward* and presented here, the court cannot find that *reasonable* inferences on the impartiality of the Board are presented. *See Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348 (the court must consider *reasonable* inferences that can be drawn from the facts).

As to denial based on Salcido's diagnosis of dementia, nothing permitted the County to define "mental illness" for purposes of the single entry point system, as it relates to involuntarily committed individuals, differently from the statutory definition of "mental illness" for purposes of involuntary commitment in IOWA CODE § 229.1(7). Thus, reliance on a different definition generates only inferences of an attempt to avoid the statutory definition, and hence, to avoid providing statutorily mandated services. Although the County apparently relies on approval of its County Management Plan by the IDHS as establishing the Board's good faith reliance on the definition of "mental illness" in its Plan, the County Board relied on a Plan and a definition that had not yet been approved at the time Salcido was originally denied placement. Rather, the Plan last approved by the IDHS, the County's Plan for fiscal 1998 (calendar year 1997–1998), defined as eligible persons those who "[h]ave been found to be seriously mentally im-

paired and involuntarily court-ordered to receive services." *See* State Defendants' Statement Of Undisputed Facts, Exhibit 5, County Management Plan Effective July 1, 1996, Sec. F, ¶ 2 (documents page 78). Pursuant to IOWA CODE § 331.439(1)(e), "[c]hanges to the approved plan are submitted at least sixty days prior to the proposed change and are not to be implemented prior to the director of human services' approval." Similarly, whatever the County's "conception" of its Management Plan as "provision of services of last resort," the Iowa Code unequivocally established the County's responsibility, in the *first* instance, for the costs of mental health services for involuntarily committed persons with legal settlement in the County, *see* IOWA CODE § 230.1, so that any contrary "conception" suggests only a refusal to bear statutorily required expenses. Finally, the only reasonable inference that arises from attempts to apply retroactively the County's fiscal 1998 Plan—which denied long-term residential care services, but was not approved until December 7, 1998—as a justification on appeal for a denial of services for Salcido months earlier in July of 1998 is that the justification is pretextual. Thus, all of the County Board's "objective" reasons for denying Salcido an appropriate placement in July of 1998 suggest only post-hoc, pretextual justifications that undermine, rather than support, any contention that the Board constituted an impartial decision-maker as required by due process. *See Johnson,* 172 F.3d at 537 (" 'In general, due process requires that a hearing before *an impartial decisionmaker* be provided at a meaningful time, and in a meaningful manner.' ") (quoting *Coleman,* 40 F.3d at 260).

Therefore, the court concludes that Salcido is entitled to summary judgment against both the County and the State Defendants to the effect that the defendants violated his due process rights to notice and a hearing before an impartial decision-maker on appropriate placement, both on the face of the pertinent statutory and administrative provisions, and as pro-

cedures were actually applied in Salcido's case.

### C. Salcido's Disability Discrimination Claims

All parties have also moved for summary judgment in their favor on Salcido's disability claims pursuant to Title II of the ADA and the Rehabilitation Act. As the Eighth Circuit Court of Appeals has explained, claims under the RA and Title II of the ADA are closely related:

> Title II of the ADA "prohibits qualified individuals with disabilities from being excluded from participation in or the benefits of the services, programs, or activities of a public entity." *Randolph v. Rodgers,* 170 F.3d 850, 857 (8th Cir. 1999). Similarly, § 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability ... shall ... be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a) (2000). We have held that the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504 of the Rehabilitation Act. *See Hoekstra [v. Independent Sch. Dist. No. 283,]* 103 F.3d [624,] 626 [ (8th Cir. 1996) ]. As an affirmative .defense, a defendant may demonstrate that the requested accommodation would constitute an undue burden. *See Gorman,* 152 F.3d at 911.

*Birmingham v. Omaha Sch. Dist.,* 220 F.3d 850, 856 (8th Cir.2000); *Gorman v. Bartch,* 152 F.3d 907, 911–12 (8th Cir.1998) (describing the requirements of the two statutes and stating "[t]he ADA has no federal funding requirement, but it is otherwise similar in substance to the Rehabilitation Act, and 'cases interpreting either are applicable and interchangeable' ") (quoting *Allison v. Department of Corrections,* 94 F.3d 494, 497 (8th Cir.1996)).

As the Eighth Circuit Court of Appeals has also explained,

> To state a prima facie claim under the ADA, a plaintiff must show: 1) he is a

person with a disability as defined by statute; 2) he is otherwise qualified for the benefit in question; and 3) he was excluded from the benefit due to discrimination based upon disability. *See* 42 U.S.C. § 12131 *et seq.; see also Gorman [v. Bartch],* 152 F.3d [907,] 911–12 [(8th Cir.1998) ]; *Doe v. University of Md. Med. Sys. Corp.,* 50 F.3d 1261, 1265 (4th Cir.1995). The RA contains the additional requirement that the plaintiff show the program or activity from which he is excluded receives federal financial assistance. *See Gorman,* 152 F.3d at 911; *Thomlison v. City of Omaha,* 63 F.3d 786, 788 (8th Cir.1995).

*Randolph v. Rodgers,* 170 F.3d 850, 858 (8th Cir.1999). Moreover, "[t]o establish a *violation* of the Acts, [the plaintiff] must demonstrate: 1) he is a qualified individual with a disability; 2) he was excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the entity; and 3) that such exclusion, denial of benefits, or other discrimination, was by reason of his disability." *Layton v. Elder,* 143 F.3d 469, 472 (8th Cir.1998) (elements of a claim pursuant to Title II of the ADA) (emphasis added); *and compare Gorman,* 152 F.3d at 911 (RA case, citing 29 U.S.C. § 794(a) and *Layton* for a statement of the elements the plaintiff must prove "to prevail,"

adding to the second element that the plaintiff must prove that the program or activity is that of a public entity "which receives federal funds").

### 1. Disability discrimination by the State Defendants

Salcido contends that there is no genuine issue of material fact (1) that he was a qualified individual with a disability, because he had met the eligibility requirements for mental health services, where he had been involuntarily committed pursuant to IOWA CODE CH. 229; (2) that he was denied benefits; and (3) that the denial was based on his disability, dementia. He contends that the State Defendants approved the County's discriminatory plan, which excludes services for persons suffering from dementia, and also denied him admittance to CMHI on the basis of the County's refusal to pay pursuant to that discriminatory plan. He therefore contends that he is entitled to prospective injunctive relief enjoining the State Defendants from denying him admittance to CMHI for these discriminatory reasons. Although the State Defendants relied primarily on a reassertion of their contention that the Eleventh Amendment bars Salcido's disability discrimination claims, a contention this court rejected in ruling on the State Defendants' motion to dismiss, *see Salcido,* 66 F.Supp.2d at 1043–45,[8] they

---

**8.** By letter dated August 17, 2000, the Iowa Attorney General's Office advised the court that it has joined with thirteen other states in an *amicus* brief to the United States Supreme Court in *University of Alabama v. Garrett,* No. 99–1240, which is on *certiorari* from a decision of Eleventh Circuit Court of Appeals, *Garrett v. University of Alabama,* 193 F.3d 1214 (11th Cir.1999), urging the Court to uphold the applicability of the ADA to the states. However, the Attorney General's Office also advised this court that, notwithstanding the State's position in *Garrett,* the State would continue to assert Eleventh Amendment immunity under existing Eighth Circuit Court of Appeals precedent as long as such a defense was viable.

Therefore, in resistance to Salcido's motion for summary judgment and in support of their own motion for summary judgment, the State

Defendants reasserted their Eleventh Amendment immunity to Salcido's disability discrimination claim. They point out that the Eighth Circuit Court of Appeals has concluded that both the RA and Title II of the ADA exceed Congress's power under § 5 of the Fourteenth Amendment. Consequently, they contend that the court improperly concluded that *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), permits a suit for prospective injunctive relief against state officials in their official capacities to comply with federal laws that have been determined to exceed congressional power. They contend that *Bradley v. Arkansas Dep't of Ed.,* 189 F.3d 745, 753–54 (8th Cir.1999), upon which the court relied, has been vacated, and that, in any event, the pertinent portion of *Bradley* is *dicta.* They contend that the *dicta* portion of the *Bradley* decision is contrary to explicit holdings of other Circuit Courts of Appeals.

also contend that they, not Salcido, are entitled to summary judgment on the merits of his disability discrimination claims against them. As to the merits of Salcido's allegations of disability discrimination, the State Defendants contend that neither the State's approval of the County's plan nor the State's refusal to admit Salcido to CMHI is sufficient to establish liability for disability discrimination, where the State had no way of knowing that the County would interpret its plan in a discriminatory way and relied only on the County's refusal to pay for services, not the County's discrimination, as the basis for refusing admission to CMHI.

The court finds that it need not reach the intricate and intriguing question of the interplay of Eleventh Amendment immunity and the *Ex Parte Young* exception here. Rather, the court concludes that, even if *Ex Parte Young* is applicable, and Salcido's claims of disability discrimination can go forward against the State Defendants notwithstanding Eleventh Amendment immunity of the State, there is no genuine issue of material fact that prevents summary judgment in favor of the State Defendants on Salcido's disability discrimination claim. The State Defendants concede, for the purposes of summary judgment, that Salcido was a disabled person qualified for the program at CMHI and that he was denied admission to CMHI. However, they contend that there is no genuine issue of material fact that *they* did not exclude Salcido from CMHI because of his disability. Thus, the State Defendants' contentions require the court to focus on the last requirement of Salcido's disability discrimination claim, whether Salcido was denied admission to CMHI "by reason of his disability." *See Layton*, 143 F.3d at 472 (elements of a claim pursuant to Title II of the ADA); *Gorman*, 152 F.3d at 911 (elements of a claim pursuant to the RA).

 One issue regarding the applicability of *Ex Parte Young* must nevertheless be addressed in light of these contentions. That issue is the State Defendants' contention that *Ex Parte Young* does not permit the court to opine on the legality of the defendants' past conduct, as that decision permits only *prospective* relief. In *Entergy, Ark., Inc. v. Nebraska*, 210 F.3d 887 (8th Cir.2000), the Eighth Circuit Court of Appeals rejected a similar contention:

> Nebraska's argument that injunctive relief under *Ex Parte Young* cannot be premised on proof of past misconduct by the state is similarly without merit: such relief is "available where a plaintiff alleges an ongoing violation of federal law, and where the relief sought is prospective rather than retrospective." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 294, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997) (O'Connor, J., concurring) (emphasis in original). While the relief granted under *Ex Parte Young* may only be prospective, proof for the claim necessitating relief can be based on historical facts, and most often will be. *See, e.g., Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (state had failed to provide aid within federally imposed time limits).

*Entergy, Ark., Inc.*, 210 F.3d at 898. Thus, the court not only can, in this case it must, determine whether the State Defendants violated the RA and Title II of the ADA, and whether that violation continues,

They also contend that *Ex Parte Young* is inapplicable here, because that decision does not permit the court to opine on the legality of past conduct by the State. They also contend that *Ex Parte Young* is inapplicable where there is a specific remedial statute, as there is in the case of the ADA and the RA, citing *Seminole Tribe v. Florida*, 517 U.S. 44, 74, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996).

In his reply brief, Salcido asserts that this court properly analyzed the issue of the State Defendants' Eleventh Amendment immunity in its ruling on the State Defendants' motion to dismiss and no intervening, controlling decision requires a different result. Salcido also contends that the RA and Title II of the ADA have only been determined to exceed the scope of Congress's power *under § 5 of the Fourteenth Amendment*, and thus are not necessarily "unconstitutional" enactments, and so may still provide the basis for relief under *Ex Parte Young*.

to determine whether any relief can be granted within the scope of *Ex Parte Young*. Again, the past and continuing violations Salcido alleges were perpetrated by the State Defendants are the State Defendants' approval of the County's discriminatory plan and their refusal to admit him to CMHI on the basis of the County's discriminatory plan.

### a. Liability based on plan approval

As the court noted above, the County apparently relies on approval of its County Management Plan by the IDHS as establishing the Board's good faith reliance on a definition of "mental illness" in its Plan that excluded dementia, and hence, excluded Salcido from coverage. Similarly, Salcido apparently contends that the State Defendants approved the County plan that discriminated against Salcido on the basis of his diagnosis of dementia, and thus excluded him from CMHI on the basis of the discriminatory plan. However, as the court concluded above, the County Board relied on a Plan and a definition that had not yet been approved by the State Defendants at the time Salcido was originally denied placement. The Plan last approved by the IDHS prior to the denial of Salcido's admission to CMHI, the County's Plan for fiscal 1998 (calendar year 1997–1998), defined as eligible persons those who "[h]ave been found to be seriously mentally impaired and involuntarily court-ordered to receive services." *See* State Defendants' Statement Of Undisputed Facts, Exhibit 5, County Management Plan Effective July 1, 1996, Sec. F, ¶ 2 (documents page 78). Pursuant to Iowa

CODE § 331.439(1)(e), "[c]hanges to the approved plan are submitted at least sixty days prior to the proposed change and are not to be implemented prior to the director of human services' approval." Consequently, no plan approved by the State Defendants permitted "discrimination" by the County on the basis of Salcido's diagnosis of dementia at the time Salcido was first denied admission to the CMHI. Therefore, the State Defendants cannot be liable for any discrimination by the County based on approval of the County's purportedly discriminatory plan. Moreover, the State Defendants' subsequent approval of the version of the County's Plan that contained the purportedly discriminatory definition of "mental illness" is not responsible for Salcido's continued exclusion from CMHI,[9] where that plan is not applicable, as a matter of law, to Salcido's exclusion from mental health services while he was subject to involuntary commitment.[10]

### b. Liability based on refusal to admit

■ Salcido contends that the State refused to admit him to CMHI without County approval, and the County withheld its approval on the basis of its "discriminatory" plan, apparently suggesting that the State Defendants thereby adopted or ratified the County's discrimination. However, the State Defendants contend, and the only evidence in the record shows, that the State refused to admit Salcido to CMHI only because the County would not approve funding for his placement. Specifically, the record shows that, on July 29, 1998, CMHI informed Marian Health Center that it would not accept Salcido, be-

9. Although Salcido has been admitted to the CMHI at state expense, that admission was pursuant to a stipulated preliminary injunction that reserved the rights of all parties to pursue their claims and defenses in this litigation. Hence, Salcido's continued exclusion from the CMHI, in the absence of the preliminary injunction, remains a "live" controversy.

10. Nevertheless, the court is disturbed that the Director of the Iowa Department of Human Services could approve a county plan, such as the County's fiscal 1999 Plan, that did not provide mental health services for *all*

persons involuntarily committed pursuant to Iowa Code Ch. 229. The Director is to review the plan for compliance with the requirements of Iowa Code § 331.439(1)(c)(2), some of which the court believes would have encompassed consideration of the County's definition of "mental illness." *See, e.g.,* Iowa Code § 331.439(1)(c)(2)(1) (the enrollment and eligibility process), (b) (scope of services included). Certainly, the Director reviewed the County's 1999 plan for eligibility requirements for Title XIX recipients. Thus, the court is concerned that the Director's scrutiny of county plans may not be adequate.

cause defendant Woodbury County would not authorize Salcido's placement at CMHI.

Salcido himself points to only two pieces of evidence indicating why the State·declined to admit him to CMHI. First, Salcido points to an answer by the State Defendants to an interrogatory concerning why the State did not "allow him to be admitted to [CMHI] in August, 1998, through December, 1998," which states the following:

Mr. Salcido has legal settlement and residency in Woodbury County. An application was filed in Woodbury County for his involuntary commitment pursuant to Iowa Code chapter 229. At the time this application was filed, there was no indication Mr. Salcido would pay his own costs of hospitalization or that he had any private insurance coverage. As a result, Woodbury County was responsible for the costs of his mental health care during his involuntary commitment. Iowa Code section 229.13 provides that for persons whose expenses are payable in whole or in part by a county the individual is to be committed to the care of a hospital or facility designated through the single entry point process. It was the responsibility of Woodbury County to designate a facility where Mr. Salcido should be placed following commitment. The central point coordination administrator from Woodbury County stated to DHS that she would not authorize Mr. Salcido's commitment to [CMHI]. Since Woodbury County did not designate it, Mr. Salcido could not be accepted at [CMHI].

State Defendants' Answer to Interrogatory No. 3, Plaintiff's Documents in Support of Summary Judgment at 60.

Similarly, Salcido points to a more detailed statement of the circumstances surrounding the State's refusal to admit Salcido to CMHI in the Affidavit of Cyndy Johnson, a psychiatric nurse employed by Marian Behavioral Care, who was involved with Marian Health Center staff in efforts to place Salcido at CMHI. *See* Affidavit of Cyndy Johnson, ¶ 1, Plaintiff's Documents in Support of Summary Judgment at 68. Ms. Johnson avers, in pertinent part, as follows:

8. On June 26, 1998 [prior to commitment proceedings], I was advised that [CMHI] is unable to accept Medicaid funding until a patient is age 65 [Mr. Salcido was not yet 65] because it is a state facility. We attempted to find other placements. We also spoke with Lynn Nibblink at the Department of Human Services for the State of Iowa. According to her, Mr. Salcido's case could not be considered a state case because legal settlement was determined to be in Woodbury County. The state would have to follow the policies outlined in Woodbury County's plan. No placements were found that would accept Mr. Salcido's funding or meet his needs.

\* \* \* \* \* \*

14. On July 27, 1998 [after commitment by the hospitalization referee], another order was received from the court indicating that Mr. Salcido should be placed at [CMHI]. Woodbury County took no further action regarding funding. At this time, Brian Damon [a Marian Health Center social worker] was advised by Phil Jorgensen of [CMHI] that Harold Templeton, the Director of the Division of MR, MH, and DD, for the Department of Human Services, was concerned about accepting Mr. Salcido at [CMHI] because it would violate Woodbury County's plan. I was told that he wanted the matter referred to his legal counsel.

15. On July 29, 1998, Phil Jorgensen of [CMHI] advised Brian Damon, Marian Health Center Social Worker, that a bed was available for Mr. Salcido. He told Brian Damon that Mr. Salcido's case was in the hands of the Attorney General's Office and that the problem continued to be whether the placement of the patient at [CMHI] would violate Woodbury County's plan. He also stated that Woodbury County had not made provisions for the elderly at [CMHI] and

had not filed the CPC plan for that year and had not authorized the state to utilize last year's plan. Les Gurdin, the hospitalization referee, was contacted by Brian Damon. He stated that he had been on the phone for three hours with the attorney general and he asked that the hospital take no further action for the next few days. Mr. Jorgenson from [CMHI] advised Brian Damon that he was hoping to be able to accept Mr. Salcido within the next few days pending a ruling by the Attorney General....

\* \* \* \* \* \*

17. On August 3, Mr. Jorgenson of [CMHI] contacted Judy Graber [of Marian Health Center] regarding placement of Mr. Salcido at [CMHI]. He stated that he was not able to accept the patient until payment questions were answered. He also stated that he was unable to hold a bed any longer, but he would keep Mr. Salcido on the waiting list....

Affidavit of Cyndy Johnson, Plaintiff's Documents in Support Of Summary Judgment at 70–73.

Nothing in this evidence gives rise to a reasonable inference that the State declined to place Salcido at CMHI for any reason other than the County's refusal to pay for the placement, where the State believed the County was responsible for the costs of Salcido's commitment as Salcido's county of legal settlement. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (the court must consider *reasonable* inferences that can be drawn from the facts). The State's belief that the County was responsible for payment, but the County had not approved of the placement because it would "violate" the County's plan, does not give rise to any inference that the State's denial of placement for Salcido at CMHI was an adoption of a discriminatory rationale by the County or otherwise a denial of placement "by reason of [Salcido's] disability." *Layton*, 143 F.3d at 472 (elements of a claim pursuant to Title II of the ADA); *Gorman*, 152 F.3d at 911 (elements of a claim pursuant to the

RA). Nor has Salcido offered any evidence indicating that the State's reason for denying Salcido placement at CMHI, because the County would not fund it, was a pretext for the State's own disability discrimination.

Therefore, the State Defendants are entitled to summary judgment on Salcido's disability discrimination claims pursuant to the RA and Title II of the ADA.

### 2. Disability discrimination by the County

Again, as to his disability discrimination claim against the County, Salcido contends that there is no genuine issue of material fact on any of the elements of his claim. Specifically, he contends that his diagnosis was plainly one of the bases upon which the County premised denial of services, and thus the County plainly discriminated against him "by reason of his disability." The County contends that Salcido is not a "qualified individual," although he may or may not be disabled, because he did not qualify for mental health services at County expense, because his diagnosis, dementia, was excluded from coverage under the County's Mental Health Services Management Plan. Similarly, the County contends that Salcido was not denied benefits by reason of his disability, or at the very least, there are genuine issues of material fact as to whether or not he was denied benefits by reason of his disability, where *all* persons with dementia are denied coverage under the County's Plan. Finally, the County contends that there are genuine issues of material fact as to whether any modification of its Plan would be reasonable.

#### a. Salcido's "qualification" for services

■ As to the County's contention that Salcido cannot demonstrate the first element of his disability discrimination claim—that he is a *qualified* individual with a disability, *Layton*, 143 F.3d at 472 (elements of a claim pursuant to Title II of the ADA); *Gorman*, 152 F.3d at 911 (ele-

ments of a claim pursuant to the RA)—because Salcido suffered from dementia, which was excluded from the County's Plan, is wrong as a matter of law. Salcido was disabled by his "dementia," and "qualified" for mental health services at County expense by virtue of his involuntary commitment pursuant to IOWA CODE CH. 229 and his legal settlement in the County. *See* IOWA CODE § 230.1 ("The necessary and legal costs and expenses attending the taking into custody, care, investigation, admission, commitment, and support of a person with mental illness admitted or committed to a state hospital shall be paid ..., [b]y the county in which such person has a legal settlement, or ... [b]y the state when such person has no legal settlement in this state, or when such settlement is unknown."). In other words, IOWA CODE CH. 229, not the County's Plan, determines "who ... meets the essential eligibility requirements for the receipt of services" upon involuntary commitment, 42 U.S.C. § 12131(2) (defining "qualified individual with a disability" for purposes of Title II of the ADA); *see also* 29 U.S.C. § 705(20) (defining "qualified individual with a disability" for purposes of the RA, 29 U.S.C. § 794(a) (erroneously referring to § 706(20)), as a qualified person who "has a physical or mental impairment which for such individual constitutes or results in a substantial impediment to employment"); the County's Plan only becomes pertinent to where a person who has been involuntarily committed is placed, not to his or her qualification for services from a public entity upon involuntary commitment. *See* flow chart, *supra* at page 920, and discussion following in Section II.B.2.c.ii.

### b. Discrimination "by reason of his disability"

■ Thus, the question is whether or not the County's exclusion of Salcido from such services was by reason of his disability—the third element of his claim. *Layton*, 143 F.3d at 472 (elements of a claim pursuant to Title II of the ADA); *Gorman*, 152 F.3d at 911 (elements of a claim pursuant to the RA). Here again, the County's contentions are without merit as a matter of law. The County cites no authority for the proposition that persons with dementia as severe as Salcido's are not "disabled" within the meaning of the RA or Title II of the ADA. *See* 29 U.S.C. § 794(a); 42 U.S.C. § 12131(2). Nor does exclusion of *all* persons with a specified disability, whatever the degree, from benefits provided to other disabled persons excuse discrimination by reason of that particular disability. The Supreme Court recently, and emphatically, rejected such a contention in *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999). Specifically, the majority in *Olmstead* rejected the dissent's "notion that 'this Court has never endorsed an interpretation of the term "discrimination" that encompassed disparate treatment among members of the same protected class,' *post*, at 2194 (opinion of Thomas, J.), that '[o]ur decisions construing various statutory prohibitions against "discrimination" have not wavered from this path,' *post*, at 2194–2195, and that 'a plaintiff cannot prove "discrimination" by demonstrating that one member of a particular protected group has been favored over another member of that same group,' *post*, at 2195–2196." *Olmstead*, 527 U.S. at 598 n. 10, 119 S.Ct. 2176. The majority stated that this contention was "incorrect as a matter of precedent and logic," and cited cases establishing the contrary proposition that discrimination is still actionable, even if it is only between members of a protected class. *Id.* Thus, the County's contention that there has been no discrimination by reason of Salcido's disability, dementia, when all persons with dementia are excluded from services, cannot be sustained. Indeed, the County's contention is as ludicrous as the suggestion that it wouldn't be discrimination "by reason of race" if all black persons were excluded from public services, but Asians and Hispanics were not excluded.

Moreover, the court rejected above the County's purportedly "objective"—and therefore presumably non-discriminato-

ry—reasons for refusing to pay for Salcido's placement at CMHI. Just as these "objective" justifications provided no *reasonable* inferences as to the impartiality of the County Board of Supervisors, as the County contended in support of its motion for summary judgment on Salcido's procedural due process claim, they present no reasonable inferences that the County's decision was nondiscriminatory. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348 (the court must consider *reasonable* inferences that can be drawn from the facts). To recapitulate briefly, nothing permitted the County to define "mental illness" for purposes of its Plan differently from the statutory definition of "mental illness" for purposes of involuntary commitment in IOWA CODE § 229.1(7), so that reliance on a different definition to exclude persons with dementia generates only inferences of an attempt to exclude persons with a specific disability, which is forbidden by *Olmstead.* Similarly, the County cannot rely in good faith on supposed approval of its Plan by the State, where the County Board relied on a Plan and a definition that had not yet been approved at the time Salcido was originally denied placement. Next, whatever the County's "conception" of its Management Plan as "provision of services of last resort," the Iowa Code unequivocally established the County's responsibility, in the *first* instance, for the costs of mental health services for involuntarily committed persons with legal settlement in the County, *see* IOWA CODE § 230.1, so that any contrary "conception" suggests only a refusal to bear statutorily required expenses on the basis of a particular disability. Finally, the only reasonable inference that arises from attempts to apply retroactively the County's fiscal 1998 Plan, which was not approved until December 7, 1998, as a justification on appeal for a denial of services for Salcido months earlier in July of 1998 is that the justification is pretextual. Thus, all of the County Board's "objective" reasons for denying Salcido an appropriate placement in July of 1998 suggest only post-hoc, pretextual justifications that un-

dermine, rather than support, any contention that the Board had legitimate, nondiscriminatory reasons for denying funding for Salcido's placement.

Therefore, as a matter of law, Salcido has demonstrated all of the elements of his disability discrimination claim against the County.

### c. The County's affirmative defense

■ As a last ditch stand, the County asserts that there are genuine issues of material fact as to whether a modification to its eligibility requirements to include services for involuntarily committed persons suffering from dementia would not be "reasonable." The court acknowledges that a defendant on a claim pursuant to the RA or Title II of the ADA may raise an affirmative defense that the requested accommodation would constitute an undue burden. *See Birmingham*, 220 F.3d at 856; *Gorman*, 152 F.3d at 911. However, the court also agrees with Salcido that the County has not pointed to any shred of evidence that would generate a genuine issue of material fact as to such an affirmative defense in this case. "When a moving party has carried its burden under *Rule 56(c)*"—as Salcido has done here as to the County's liability for disability discrimination—"its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348. Rather, the non-movant, here the County, is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir.1997), *cert. denied*, 523 U.S. 1040, 118 S.Ct. 1336, 140 L.Ed.2d 498 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995). "[A] non-moving party may not rest upon mere denials or allegations," which is all that the County has offered here, "but

must instead set forth specific facts sufficient to raise a genuine issue for trial." *Rose–Maston v. NME Hospitals, Inc.,* 133 F.3d 1104, 1107 (8th Cir.1998); *Thomas v. Runyon,* 108 F.3d 957, 959 (8th Cir.1997); *Ruby v. Springfield R–12 Pub. Sch. Dist.,* 76 F.3d 909, 911 (8th Cir.1996). Therefore, the County has failed to point to any evidence "such that a reasonable jury could return a verdict for the [County]" on the basis of its affirmative defense. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As a matter of law, the County's bald assertion of the "unreasonableness" of requiring it to pay for Salcido's care does not establish the County's affirmative defense.

Moreover, the court concludes that any affirmative defense premised on the assertion that it is not reasonable for the County to modify its Plan to pay for the placement of involuntarily committed persons with dementia cannot stand in the face of the State's legislative mandate that the County, as the county of legal settlement, must pay "[t]he necessary and legal costs and expenses attending the taking into custody, care, investigation, admission, commitment, and support of a person with mental illness admitted or committed to a state hospital." *See* Iowa Code § 230.1. Modification of the County's Plan to comply with state law is "reasonable"; it is refusal to do so that is not reasonable.

Therefore, in the absence of a viable affirmative defense, Salcido is entitled to summary judgment in his favor against the County on his claims of disability discrimination in violation of the RA and Title II of the ADA.

### D. The State Defendant's Cross-Claim Against The County

■ Finally, the court turns to the State Defendants' motion for summary judgment in their favor against the County on their cross-claim, in which they assert that the County, as Salcido's county of legal settlement, is mandated by Iowa Code Ch. 229 to pay for services for Salcido at an appropriate facility following commitment proceedings, but the County has failed to do so.

#### 1. Arguments of the parties

In support of their motion for summary judgment on their cross-claim, the State Defendants assert that the statutory scheme, which allocates the costs of care of involuntarily committed persons to the county of legal settlement, subject to the placement of such individuals to the institution designated by the county's single entry point plan, permits the responsible county to designate the place services can be provided in the most cost-effective manner, but does not give the county any authority to refuse to designate any placement or to refuse to pay for an appropriate placement. To read the code provisions to permit the county to escape its obligations would leave an involuntarily committed person with the right to care as his or her condition warrants that is established in Iowa Code § 229.23, but no way to acquire the care to which he or she has a right. Such a reading, the State Defendants contend, would plainly violate *Youngberg* 's requirement that such persons receive "adequate" treatment. The State Defendants argue that the county responsible for costs of care cannot escape that responsibility when an involuntarily committed person is moved from his or her initial "hospitalization" placement, pursuant to Iowa Code § 229.23, to a permanent placement, pursuant to Iowa Code § 223.14, even though a requirement that the latter placement be made pursuant to the county's single entry point process is not repeated in § 223.14. Nor, they contend, was the part of § 230.1 that permits the county to escape liability for costs of involuntarily committed persons if their placement is not pursuant to the single entry point process intended to permit the county to refuse to designate an appropriate placement, as such an interpretation would potentially burden the state with the refusal of any of the ninety-nine counties in Iowa to designate an appropriate placement. In short, the State Defendants contend that, as a matter of

law, the County has refused to pay for Salcido's placement without legal justification.

The grounds for the County's resistance to the State Defendants' motion for summary judgment on their cross-claim and the County's own motion for summary judgment on that cross-claim are not immediately apparent. The County's motion for summary judgment does not identify the party or parties against whom it is brought and no part of the County's joint brief in resistance to the plaintiff's motion for summary judgment and in support of its own motion for summary judgment clearly addresses the State Defendants' motion for summary judgment on their cross-claim. Nevertheless, it appears that the County argues that it is simply not responsible for the costs of Salcido's placement at CMHI, because such placement was in violation of its single entry point process plan for mental health services.

### 2. The County's liability for the costs of Salcido's care

There is no dispute here that Woodbury County is, and was at all relevant times, Salcido's county of legal settlement. As such, the County is liable, in the first instance, for the costs of Salcido's care. *See* Iowa Code § 230.1 ("The necessary and legal costs and expenses attending the taking into custody, care, investigation, admission, commitment, and support of a person with mental illness admitted or committed to a state hospital shall be paid ... [b]y the county in which such person has a legal settlement, or ... [b]y the state when such person has no legal settlement in this state, or when such settlement is unknown."). The County's liability for costs is limited by the requirement that placements must be pursuant to the County's single entry point process. The court concluded above, in its analysis of the statutory scheme for placement of involuntarily committed individuals, that although the provisions providing for the immediate custody of the respondent, Iowa Code § 229.11, and for initial placement after the determination of "serious mental impairment" in the "hospitalization hearing," Iowa Code § 229.13, were amended in 1996 to require placement of persons whose expenses will be paid by the county to a facility "designated through the single entry point process," no such amendment was made to § 229.14, the provision providing for the ultimate placement of the committed person upon the chief medical officer's recommendation. *See* Iowa Code § 229.14. Nevertheless, ultimate placement pursuant to § 229.14 is still subject to the requirements of the "single entry point system," by virtue of § 229.1B, which provides that, "[n]otwithstanding any provision of this chapter to the contrary, any person whose hospitalization expenses are payable in whole or in part by a country shall be subject to all requirements of the single entry point process." Iowa Code § 229.1B; *see also* Iowa Code § 230.1 ("A county of legal settlement is not liable for costs and expenses associated with a person with mental illness unless the costs and expenses are for services and other support authorized for the person through the single entry point process.").

However, the court also agrees with the State Defendants that nothing about this statutory scheme permits the County to escape responsibility for the costs of care in Salcido's case. This is so, because, as a matter of law, nothing permitted the County to define "mental illness" for purposes of its Plan differently from the statutorily definition of "mental illness" for purposes of involuntary commitment of Iowa Code § 229.1(7). Moreover, the different definition of "mental illness" on which the County relied for its refusal to fund Salcido's placement at CMHI was in a Plan that had not yet been approved at the time Salcido was originally denied placement. Rather, the Plan last approved by the IDHS, the County's Plan for fiscal 1998 (calendar year 1997–1998), defined as eligible persons those who "[h]ave been found to be seriously mentally impaired and involuntarily court-ordered to receive services." *See* State Defendants' Statement Of Undisputed Facts, Exhibit 5, County Manage-

ment Plan Effective July 1, 1996, Sec. F, ¶ 2 (documents page 78). Pursuant to IOWA CODE § 331.439(1)(e), "[c]hanges to the approved plan are submitted at least sixty days prior to the proposed change and are not to be implemented prior to the director of human services' approval." Thus, the County's different definition could not yet have been implemented at the time the County refused to approve Salcido's placement.

Therefore, the court concludes that the State Defendants have established, as a matter of law, that the County was responsible for the costs of Salcido's care and failed or refused to pay those costs without any adequate legal justification. Consequently, the State Defendants are entitled to the relief they seek on their cross-claim as a matter of law, which simply requires the County to bear the costs it was obligated to pay under IOWA CODE § 230.1.

## III. CONCLUSION

The court will continue its "thematic" approach in this summary, taking each of Salcido's claims in turn, saving a motion-by-motion treatment for its disposition below. As to Salcido's procedural due process claim, as a matter of law, neither the County nor the State Defendants have provided procedures that, on their face, provide adequate protections for the liberty interest of a person subjected to involuntary commitment. Specifically, Iowa's statutory provisions fail to provide any notice or hearing that addresses the denial by a county, through its single entry point system, of an involuntarily committed person's liberty interest in an appropriate placement. Nor are the additional grievance procedures identified by the County sufficient to overcome the procedural inadequacies of the statutory system. The absence of any notice and hearing procedures on placement necessarily establishes that there is no provision on the face of the procedures for an impartial decision-maker on placement, either. Moreover, as a matter of law, Salcido did not receive adequate procedural protections in his case. Contrary to the State Defendants' assertion, it is precisely at the point where § 229.14 provides inadequate procedural safeguards concerning ultimate placement that the process broke down in this case, so that the flaw in the statutory scheme actually was responsible for the denial of Salcido's due process rights to notice and a hearing on denial of an appropriate placement. Although the adequacy of the procedures applied by the County in Salcido's case turned on whether Salcido received an impartial decision-maker on the County's placement determination, as a matter of law, Salcido did not receive that protection. Rather, under the standards stated in *Ward v. Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), the position of the County Board as partisans and judges concerning County funding of mental health services necessarily involved a lack of due process of law in the consideration of Salcido's appeal of the denial of mental health services. In the alternative, assuming that only a rebuttable presumption of partiality is established by the circumstances identified in *Ward* and presented here, no reasonable inferences on the impartiality of the Board are presented, where all of the County Board's "objective" reasons for denying Salcido an appropriate placement in July of 1998 suggest only post-hoc, pretextual justifications that undermine, rather than support, any contention that the Board constituted an impartial decision-maker as required by due process. Salcido is therefore entitled to summary judgment on his procedural due process claim against both the County and the State Defendants. Therefore, Salcido is entitled to summary judgment against both the County and the State Defendants to the effect that the defendants violated his due process rights to notice and a hearing before an impartial decision-maker on appropriate placement, both on the face of the pertinent statutory and administrative provisions, and as procedures were actually applied in Salcido's case. This decision leaves for trial only the question of damages against the County on this claim.

However, Salcido's disability discrimination claims under the RA and Title II of the ADA against the State Defendants fare considerably differently. It was unnecessary for the court to address the State Defendants renewed assertion that Eleventh Amendment immunity bars these claims against them, because, assuming that *Ex Parte Young* is applicable, Salcido cannot establish these claims against the State Defendants as a matter of law. Approval of a purportedly "discriminatory" County Plan cannot subject the State Defendants to liability in this case, where that "discriminatory" Plan was not applicable, as a matter of law, to Salcido's exclusion from mental health services while he was subject to involuntary commitment. Nor has Salcido generated a genuine issue of material fact that the State Defendants' refusal to admit him to CMHI was based on anything other than the County's refusal to pay for services. Nothing in the record suggests either that the State Defendants were adopting or ratifying the "discriminatory" aspect of the County's refusal to pay for services or suggests that the State Defendants' stated reason for refusing to admit Salcido was a pretext for conduct actually motivated by disability discrimination. Therefore, the State Defendants are entitled to summary judgment on Salcido's disability discrimination claims against them.

Salcido is entitled to summary judgment, however, on his disability discrimination claims against the County. As a matter of law, Salcido was disabled by his "dementia," and "qualified" for mental health services at County expense by virtue of his involuntary commitment pursuant to IOWA CODE CH. 229 and his legal settlement in the County. Furthermore, in light of *Olmstead v. L.C. by Zimring*, 527 U.S. 581, 598 n. 10, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the County's contention that there has been no discrimination by reason of Salcido's disability, dementia, when all persons with dementia are excluded from services, cannot be sustained. The County's proffered "objective" reasons for its refusal to provide services present no reasonable inferences that the County's decision was non-discriminatory. Therefore, as a matter of law, Salcido has demonstrated all of the elements of his disability discrimination claim against the County. Nor are there any genuine issues of material fact regarding the County's affirmative defense that requiring modification of its Plan to accommodate payment for Salcido's care would not be reasonable, which might preclude summary judgment. The County has failed to point to any record evidence that supports such a defense. In addition or in the alternative, the County's affirmative defense cannot stand in the face of the State's legislative mandate that the County, as the county of legal settlement, must pay the necessary costs in Salcido's case. *See* IOWA CODE § 230.1. Modification of the County's Plan to comply with state law is "reasonable"; it is refusal to do so that is not reasonable.

Finally, there are no genuine issues of material fact precluding summary judgment in favor of the State Defendants on their cross-claim against the County for payment for Salcido's care. The State Defendants have established, as a matter of law, that the County was responsible for the costs of Salcido's care and failed or refused to pay those costs without any adequate legal justification.

THEREFORE,

1. Salcido's July 19, 2000, motion for summary judgment is **granted in part and denied in part,** as follows:

 a. Summary judgment in favor of Salcido on his procedural due process claim is **granted** to the extent that **the court concludes and declares** that the County and State Defendants have violated Salcido's rights to procedural due process by denying him notice and a hearing before an impartial decision-maker on appropriate placement, both on the face of the pertinent statutory and administrative provisions, and as procedures were actually applied in Salcido's case, and the **defendants are hereby enjoined** to remedy their proce-

dures as those procedures have been found inadequate herein. This decision leaves for trial only the question of damages against the County on this procedural due process claim.

b. Summary judgment in favor of Salcido and against the State Defendants on Salcido's disability discrimination claims pursuant to the RA and Title II of the ADA is **denied.**

c. Summary judgment in favor of Salcido and against the County on Salcido's disability discrimination claims pursuant to the RA and Title II of the ADA is **granted** to the extent that **the court concludes and declares** that the County has discriminated against Salcido by reason of his disability in the provision of mental health services upon his involuntary commitment pursuant to IOWA CODE CH. 229, and **the County is hereby enjoined** to provide Salcido with funding for his placement at CMHI. This decision leaves for trial only the question of damages against the County on Salcido's disability discrimination claims.

2. The County's August 11, 2000, motion for summary judgment against Salcido and the State Defendants is **denied in its entirety.**

3. The State Defendants' August 14, 2000, motion for summary judgment against plaintiff Salcido is **denied,** as to Salcido's procedural due process claim, and **granted** as to Salcido's disability discrimination claims. Salcido has abandoned his substantive due process claim against the State Defendants and that claim is hereby **dismissed.**

4. The State Defendants' August 14, 2000, motion for summary judgment against the County on the State Defendants' cross-claim is **granted. The court concludes and declares,** as follows:

a. The County was responsible for designating an appropriate facility to which the hospital referee could commit Salcido on July 15, 1998, when Salcido did not require care at Marian Health Center

b. The County is responsible for the costs of Salcido's care at all times from the time that the referee determined that he was seriously mentally impaired and required commitment to a facility appropriate to his needs, including all costs expended by CMHI for the care and treatment of Salcido since his admission to the facility, and the County must pay such costs to defendant Rasmussen for the benefit of CMHI, as directed by IOWA CODE CH. 230.

5. This matter shall proceed to trial on Salcido's equal protection and substantive due process claims against the County and on damages on Salcido's procedural due process, ADA, and RA claims against the County.

**IT IS SO ORDERED.**